CONTINENTAL CASUALTY COMPANY et al., Respondents, v RAPID-
AMERICAN CORPORATION, Appellant, and NATIONAL UNION
FIRE INS. CO. OF PITTSBURGH, PA., Respondent.

First Department, February 25, 1992

## APPEARANCES OF COUNSEL

*Charles A. Booth* of counsel *(Victor G. Gleser* and *Mona Jha* with him on the brief; *Ford Marrin Esposito & Witmeyer*, attorneys), for respondents.

*Martin J. Schwartz* of counsel *(Stephen A. Marshall* with him on the brief; *Rubin Baum Levin Constant & Friedman*, attorneys), for appellant.

*Jerold Oshinsky, Randy Paar, David L. Elkind* and *Robert L. Carter* of counsel *(Anderson Kill Olick & Oshinsky, P. C.*, attorneys), for W.R. Grace & Company and others, *amici curiae.*

## OPINION OF THE COURT

WALLACH, J.

This appeal requires us to scrutinize the insurance coverage and exclusion provisions of the standard form comprehensive general liability (CGL) policy in the course of determining whether the insurance carrier must defend claims against the policyholder arising from asbestos-induced respiratory injury. Although the meaning and effect of these insurance clauses has been extensively litigated in asbestos-related cases around the country, with conflicting results, the issue—whether a CGL insurer can invoke its policy exclusion for environmental pollution in disclaiming its duty to defend

asbestos-related personal injury actions commenced against its insured—has thus far remained unanswered at the appellate level in New York. Under our construction of the CGL policy, we conclude that the environmental exclusion clause does not absolve the carrier of its duty to defend.

Plaintiff Continental Casualty Co. (Continental) issued to defendant Rapid-American Corp. (Rapid) and its predecessor, Glen Alden Corp., two CGL insurance policies, one covering the period January 1, 1971 to January 1, 1974, and a second from the latter date to January 1, 1977; additionally, Continental and plaintiff Transportation Insurance Co. (collectively CNA) sold similar coverage to Rapid for the period January 1, 1977 to January 1, 1980.

(1) The Insurance Coverage

These four CGL policies issued by CNA, for which Rapid paid $21.6 million in premiums, require CNA, among other things,

> "To pay on behalf of the Insured [Rapid] all sums which the Insured shall become legally obligated to pay as damages * * * direct or consequential, because of:
>
> A) Bodily Injury, or
>
> B) Property Damage, or
>
> C) Personal Injury, or
>
> D) Employer's Malpractice Liability
>
> Caused by or arising out of an occurrence happening during the policy period anywhere in the world, and the [insurance] Company shall have the right and the duty to defend any suit against the Insured seeking damages payable under the terms of this Policy, even if any of the allegations of the suit are groundless, false or fraudulent."

These insurance policies define "Bodily Injury" to mean "bodily injury, mental injury, mental anguish, shock, sickness, disease or disability including death resulting therefrom sustained by any person."

"Occurrence" is defined to mean "an accident or a happening or event or a *continued or repeated exposure to conditions* which unexpectedly and unintentionally results during the policy period in Bodily Injury, or Property Damage or Personal Injury, or Employer's Malpractice Liability." (Emphasis added.)

From early October 1990 to the time Rapid served its motion for partial summary judgment on November 20, 1990, Rapid timely notified CNA of 14 asbestos-related bodily injury actions which had recently been commenced against Rapid, and requested that CNA defend and indemnify Rapid. Instead of undertaking the defense of these actions, clearly involving "continued and repeated exposure" to asbestos, CNA disclaimed coverage and commenced this action for declaratory judgment relieving CNA of any further liability under the policies.

The complaints in the underlying personal injury actions based upon asbestos exposure, which Rapid requested CNA to defend, assert a familiar combination of product liability theories (e.g., negligence, breach of warranty, strict product liability). The claimants in those cases alleged bodily injury as a result of exposure to asbestos dust and fibers throughout the periods covered by CNA's CGL policies, in most cases extending from the 1950's to the 1980's, thus encompassing the coverage period of January 1, 1971 to January 1, 1980.

We note at the outset that CNA's duty to defend Rapid under these CGL policies is "exceedingly broad" *(Colon v Aetna Life & Cas. Ins. Co.,* 66 NY2d 6, 8), and indeed far broader than any ultimate liability to indemnify *(Spoor-Lasher Co. v Aetna Cas. & Sur. Co.,* 39 NY2d 875, 876-877; *Fitzpatrick v American Honda Motor Co.,* 78 NY2d 61, 65). The test to be applied, which we find wholly satisfied here, is whether within the four corners of the complaints in the underlying actions brought against Rapid, those pleadings "permit proof" of facts establishing coverage. *(See, American Home Prods. Corp. v Liberty Mut. Ins. Co.,* 565 F Supp 1485, 1500, *mod* 748 F2d 760 [applying New York law]). In *Abex Corp. v Maryland Cas. Co.* (790 F2d 119), the District of Columbia Circuit noted (at 128-129):

"Under well-settled principles of New York law, [the insured] is entitled to defense by the insurance companies if the underlying tort complaints 'permit proof' of the facts establishing coverage, or if the complaints do not exclude the possibility that injury-in-fact occurred during the policy period * * *

"Because *it is possible for asbestos-induced injuries to occur at any time following initial exposure, the tort complaints * * * 'permit proof' that the injury-in-fact occurred during the policy periods of all three insurers.* We hold, therefore, that

the insurers must immediately fulfill their duty to defend [the insured]." (Emphasis added.)

We hold that the same duty on the part of the insurers has arisen here, inasmuch as liability may be fixed upon injury-in-fact rather than actual manifestation of asbestosis or related diagnosable disease. Furthermore, since we find the coverage provisions on this aspect of the controversy unambiguous, we need not reach plaintiffs' contention that any "practical construction" by the alleged conduct of the parties has altered the plain meaning of these coverage provisions (Slatt v Slatt, 64 NY2d 966; Nau v Vulcan Rail & Constr. Co., 286 NY 188, 198-199).

■ We also reject CNA's argument that because the complaints in the underlying asbestos lawsuits include allegations of willful and wanton disregard of known scientific and medical data by some or all of the named defendants, CNA therefore cannot be liable under their policies, because an "occurrence" is limited to an event which "unexpectedly and unintentionally" results in injury. Those allegations, if established at trial, could provide the basis for an award of punitive damages. The fact that punitive damage awards have been recovered against Celotex Corporation, with whom Rapid was briefly associated in a series of several complex corporate mergers prior to 1972, does not operate to preclude or collaterally estop Rapid from litigating the knowledge issue, since it is clear that Rapid was not a party to the Celotex litigations, and as a corporation entirely distinct from Celotex with no common ownership, had no privity with or control over the conduct of those actions (Gramatan Home Investors Corp. v Lopez, 46 NY2d 481; Schwartz v Public Adm'r of County of Bronx, 24 NY2d 65).

(2) The Pollution Exclusion-to-Coverage Provision

■ In relieving CNA of any further obligations under these policies, the IAS court did not address any of the foregoing issues, but simply found that the pollution exclusion clause contained in the policies eliminated all coverage as a matter of law. We disagree.

The exclusion clause provides that coverage does not apply "To personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge,

dispersal, release or escape is sudden and accidental".* As might be expected, both sides have subjected this exclusion provision to microscopic examination in an effort to conjure forth a favorable construction. Thus, CNA urge that asbestos falls entirely within the class of "irritants, contaminants or pollutants". Rapid, to the contrary, finds comfort in the total absence of the word "asbestos". A similar clash occurs over the term "atmosphere", as to whether, as urged by Rapid, it refers to "the whole mass of air or the gaseous envelope surrounding the earth" (citing two dictionaries), or as argued by CNA, it is more properly descriptive of the air "in any given place" or "locality" (citing two other dictionaries). In our view, the resolution of this case is not to be found in this kind of lexical tomography.

CNA cite the recent Court of Appeals decision in *Technicon Elecs. Corp. v American Home Assur. Co.* (74 NY2d 66) for, among other things, the general proposition that the highest court of this State is disposed to take a no-nonsense view in favor of enforcing an environmental pollution exclusion clause as written. The IAS court went further in describing *Technicon* as "a case nearly identical to the case at bar." We are unable to read *Technicon* in that diffusive light, and hold that, properly considered, *Technicon* cuts a considerable distance here in favor of the insured.

No one in *Technicon* disputed that it was an environmental pollution case involving that company's "intentional, long-term discharge of toxic waste chemicals from Technicon's manufacturing plant into Frontera Creek in Humacao, Puerto Rico" *(supra,* at 71-72). What the court termed the "dispositive issue" was "whether Technicon's concededly intentional discharges into the waterway were both sudden and accidental within the meaning of the exception to the pollution exclusion from coverage" (at 73). None of that is pertinent here. What is helpful is the guidance furnished with respect to the construction of this exclusion clause (at 74): "The first question, then, is whether the pollution exclusion is applicable at all. To be so, *the complaint with respect to which coverage is sought must allege a discharge, dispersal, release or escape of a toxic*

---

* Preliminarily, we note that although this exclusion clause was urged by CNA as a basis for disclaimer in its motion for summary judgment, it was nowhere referred to in the complaint for declaratory relief. While a respectable argument may be made that this omission in the complaint waived the contention *(cf., General Acc. Ins. Group v Cirucci,* 46 NY2d 862), we prefer to address the issue on the merits.

*or hazardous waste which has actually resulted in pollution.* If so, the damage from the discharge of the hazardous waste is excluded from coverage by the express exclusion clause, despite qualifying as an 'occurrence' within the general terms of the policy. Here, the plaintiffs residents in the *underlying complaint clearly asserted Technicon discharged pollutants that, as alleged, resulted in harm to the environment."* (Emphasis added.)

Under this analysis by the Court of Appeals, the disclaimer asserted by CNA clearly fails. The underlying complaints before us do not allege environmental pollution of land, a water course, or the atmosphere, but simply bodily injury sustained by an ultimate user of a product. Those allegations trigger the coverage without approaching the escape hatch provided by the exclusion clause.

This conclusion is buttressed by the history of the exclusion clause in New York. In 1971 the Legislature amended former section 46 (a) (13) and (14) of the Insurance Law (now § 1113 [a] [13], [14]), requiring underwriters to include in their CGL policies the clause excluding coverage for personal injury or property damage liability arising from environmental causes other than of a sudden or accidental nature (L 1971, ch 765). The purpose was, as Governor Rockefeller indicated in his approval memorandum (1971 McKinney's Session Laws of NY, at 2633), to "assure that corporate polluters bear the full burden of their own actions spoiling the environment, and * * * preclude any insurance company from undermining public policy by offering this type of insurance protection." Permitting polluters to insure themselves against having to pay fines and other liabilities would, it was felt, undermine the effectiveness of the comprehensive, new standards being adopted to protect the environment. But a little over a decade later, the mandatory provision was removed from the statute (L 1982, ch 856), this time on the reasoning that corporate polluters, with liability insurance unavailable to them, should not be given, in effect, an avenue of escape by being forced to go out of business due to financial disability when faced with remedial obligations or civil liability to third parties *(see,* Governor Carey's memorandum, 1982 McKinney's Session Laws of NY, at 2628-2629).

During the 11 years in which the exclusion clause was mandated in CGL policies, the Fourth Department held, in *Niagara County v Utica Mut. Ins. Co.* (80 AD2d 415, *lv dismissed* 54 NY2d 831), that the clause did not operate to

relieve the carriers of the obligation to defend Niagara County, which had merely failed to prevent the toxic dumping, from lawsuits arising from the pollution at the Love Canal site. The motion court had observed (103 Misc 2d 814, 818): "The language of the Circuit Court in *Molton, Allen & Williams v St. Paul Fire & Mar. Ins. Co.* (347 So 2d 95, 99 [Ala]) the first court to interpret a pollution exclusion clause, is very illuminating in determining the application of the provision in situations such as before this court: 'It is believed that the intent of the "pollution exclusion" clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities * * * We judicially know that during the last decade, much emphasis has been placed upon protecting the environment. The pollution exclusion was no doubt designed to decrease the risk *where an insured was putting* * * * toxic chemicals * * * into the environment.' " (Emphasis in original.)

While the active-passive distinction drawn in *Niagara County* is beside the point here, far more relevant is the court's conclusion that in order to invoke the exclusion the insurer must demonstrate that " 'the intent of the "pollution exclusion" clause was to eliminate coverage for damages arising out of *pollution or contamination by industry-related activities'* " (emphasis added).

In the context of the exclusion clause we hold that as limited by "industry-related activities", its reach extends to environmental pollution occasioned by intentional discharge of a pollutant in the course of manufacturing or distribution activities by the producer of a product, but does not embrace the harm inflicted by a product fully and finally launched into the stream of commerce, and over which the manufacturer no longer exercises any control. To enlarge the legislative intent to the extent here urged by CNA would have a seemingly narrow exclusion overwhelm the clear meaning of the coverage provisions. Under the CNA construction an auto manufacturer with a CGL policy would have no coverage for the personal injury caused by a faulty tailpipe because the atmosphere was the medium which conveyed the noxious carbon monoxide; a corroding and leaking oil drum would rescind the manufacturer's product liability insurance coverage simply by the fortuitous circumstance that the contents percolated into the ground. We decline to find implicit in former Insurance Law § 46 (13) and (14), which are addressed specifically to environmental concerns, a legislative purpose to effect a total

obliteration of negligence and/or product liability coverage whenever a tangential impact on any "environment" is involved.

Concededly, the limitation we adopt with respect to the exclusion clause is not expressly to be found in the words of the clause itself, but it represents our perception of both the legislative intent in mandating the provision and the contractual intent of the parties in adopting it. In doing so, we give effect to the policy as a whole, and harmonize the otherwise conflicting provisions of the coverage and exclusion portions of the insurance policies. Because this approach is bottomed on the view that the exclusion clause is facially ambiguous, we meet once more, on this separate facet of the case, CNA's argument that resort to practical construction of the policy during the parties' course of dealing would serve to defeat our construction and exonerate CNA from its duty to defend.

The practical construction to which CNA has reference is the circumstance that from 1982 until 1990 Rapid did not call upon CNA to defend any asbestos suits commenced against Rapid. For its part, Rapid points to several actions for which it demanded defense before 1982.

In our view, CNA's resort to practical construction fails for the simple reason that the conduct of the parties vis-à-vis CNA's insurance coverage was itself more ambiguous than the text of the exclusion clause. The fact that Rapid called upon other insurance coverage issued by defendant National Union Fire Ins. Co. of Pittsburgh, Pa. (National), or obtained indemnification elsewhere, cannot be considered a concession that would relieve CNA of their contractual responsibilities. The lack of reliability of practical construction in a similar insurance litigation setting was pointedly expressed by Judge Sofaer in the *American Home Prods.* litigation *(supra,* 565 F Supp, at 1503): "Evidence on course of dealing can be ambiguous and misleading, especially in construing insurance contracts covering both liability for, and the duty to defend suits concerning, insidious diseases. Insured parties and insurers alike can be expected to behave according to their perceived self-interest by asserting in any particular litigation the theory that best suits their purposes. For example, where an insured had no coverage during the periods consumers were exposed to its products, but thereafter acquired coverage, it can be expected to advocate the manifestation theory; conversely, the insurance company in such a situation would advocate exposure as the policy trigger. Furthermore, an

insurance company's willingness to provide coverage in a particular case may simply be based on its desire to avoid litigation and may provide only spurious support for the theory its behavior reflects."

### (3) Other Insurance and Counsel Fees

■ It is clear that defendant National has issued overlapping insurance coverage for the asbestos suits pending against Rapid. Because of this circumstance, and the assertion that Rapid may have been uninsured during the periods when the injuries of the various claimants were developing with continuing exposure to asbestos filaments, CNA seek, in the alternative, a declaration that National and Rapid are responsible for their "pro rata share" of the costs of defense, adopting the approach of "Agent Orange" litigation *(Uniroyal, Inc. v Home Ins. Co.*, 707 F Supp 1368). While the magnitude of that class action may have justified that method, we are not persuaded to depart from the principle expounded in our decision in *Mendes & Mount v American Home Assur. Co.* (97 AD2d 384, 385): "The insurer's duty to defend extends to any action in which facts alleged are within the coverage afforded by the policy, whether or not the insurer turns out ultimately to be liable for any judgment rendered * * * That duty to defend, once determined as herein, extends to a defense of the entire action. Plaintiffs' right to recover the entire amount expended in the defense from American Home cannot be diminished because there may be additional insurers which may also have duties to defend. At this time, it is premature to decide whether or not American Home has any claim for contribution against the third-party defendants."

We have considered the other contentions advanced by CNA in support of their disclaimer and find them without merit.

■ Finally, we note that inasmuch as CNA initiated this action casting Rapid in a defensive posture, the latter is deserving of a declaration of entitlement to reimbursement for its legal expenses in the conduct of this action, and we so declare *(Johnson v General Mut. Ins. Co.*, 24 NY2d 42; *Glens Falls Ins. Co. v United States Fire Ins. Co.*, 41 AD2d 869, *affd* 34 NY2d 778).

Accordingly, the order and judgment (one paper) of Supreme Court, New York County (Carol E. Huff, J.), entered July 10, 1991, which denied Rapid's motion for partial summary judgment and granted the plaintiffs' cross motion for summary judgment to the extent of declaring that plaintiffs are not

required to defend and/or indemnify Rapid for asbestos-related bodily injury claims should be reversed, on the law, with costs, Rapid's motion should be granted and plaintiffs' motion denied, and the matter should be remanded for the settlement of a judgment declaring that plaintiffs are (1) obligated to provide legal representation for Rapid, and to appear in and to provide a defense for Rapid in all lawsuits involving asbestos-related bodily injury claims arising under the coverage of the insurance policy or policies issued by plaintiffs to Rapid for injuries incurred during the applicable policy coverage periods, and (2) liable to Rapid for (a) reasonable legal fees and disbursements incurred by Rapid in defense of these claims which should have been timely undertaken by plaintiffs, and (b) the reasonable legal expenses incurred by Rapid in connection with the instant action.

CARRO, J. P., ROSENBERGER, ROSS and ASCH, JJ., concur.

Order and judgment (one paper) of the Supreme Court, New York County, entered July 10, 1991, reversed, on the law, with costs, Rapid's motion is granted and plaintiffs' motion denied, and the matter is remanded for the settlement of a judgment declaring that plaintiffs are (1) obligated to provide legal representation for Rapid, and to appear in and to provide a defense for Rapid in all lawsuits involving asbestos-related bodily injury claims arising under the coverage of the insurance policy or policies issued by plaintiffs to Rapid for injuries incurred during the applicable policy coverage periods, and (2) liable to Rapid for (a) reasonable legal fees and disbursements incurred by Rapid in defense of these claims which should have been timely undertaken by plaintiffs, and (b) the reasonable legal expenses incurred by Rapid in connection with the instant action.