OPINION OF THE COURT
Kaye, J.
At issue before us is an insurer’s duty to defend actions for personal injuries sustained through exposure to asbestos products manufactured by the insured’s predecessor corporation. We resolve the questions raised in favor of the insured, concluding that in the circumstances presented, the standard form comprehensive general liability (CGL) policy requires defense of the actions.
Plaintiffs, Continental Casualty Company and Transportation Insurance Company (collectively CNA), issued four CGL policies covering the period January 1, 1971 through January 1, 1980 to defendant Rapid American Corporation (Rapid) and its predecessor Glen Alden Corporation, both successor corporations to Philip Carey Manufacturing Corporation. The policies require CNA to pay on behalf of the insured all damages for bodily injury, property damage, personal injury or employer’s malpractice liability "caused by or arising out of an occurrence happening during the policy period.” "Occurrence” is defined as "an accident or a happening or event or a continued or repeated exposure to conditions which unexpectedly and unintentionally results during the policy period in Bodily Injury, or Property Damage or Personal Injury, or Employer’s Malpractice Liability.” "Bodily Injury” is defined as "bodily injury, mental injury, mental anguish, shock, sickness, disease or disability, including death resulting therefrom sustained by any person.”
The policies also contain "pollution exclusions” providing that they do not apply:
"To personal injury or property damage arising out of the discharge, dispersal, release or escape of *647 smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.”
Finally, the policies impose upon CNA the duty to defend any suit against the insured seeking damages payable under the policies "even if any of the allegations of the suit are groundless, false or fraudulent.”
Defendant National Union Fire Insurance Company of Pittsburgh (National) became Rapid’s primary CGL carrier after January 1, 1979. On or about that date, CNA and National entered into an indemnity agreement acknowledging the intention of CNA and National that all CGL-covered losses occurring on or after January 1, 1979 would be covered by National and not CNA.
Philip Carey Manufacturing Corporation was engaged in manufacturing and distributing asbestos products, and Rapid, as one of its successors, inherited Philip Carey asbestos-related liabilities. From October 1990 forward, Rapid timely notified CNA of 14 asbestos-related bodily injury actions brought against it and requested CNA to defend and indemnify. The complaints alleged personal injury and wrongful death suffered by contractors such as electricians, insulators, steelworkers and carpenters who had worked with or around the Philip Carey asbestos products for sustained periods of time from the 1950’s through the 1980’s. CNA disclaimed coverage and brought this action to declare the parties’ rights and responsibilities under the policies.
Rapid thereafter sought partial summary judgment declaring that CNA was obligated to defend the underlying asbestos suits. CNA cross-moved for summary judgment declaring it had no liability under its policies and thus no duty to defend, and argued alternatively that if the court found a duty to defend, National and Rapid itself must share defense costs pro rata.
Supreme Court granted summary judgment to CNA, declaring it had no obligation to defend. The Appellate Division reversed and granted partial summary judgment to Rapid declaring that CNA must defend Rapid in the underlying suits. The Appellate Division refused to declare that National
*648 or Rapid should share in defense costs, finding such request premature. We now affirm.
I.
Analysis begins by setting the framework for determining the particular issues raised. This appeal involves an insurer’s duty to defend, which is "exceedingly broad” (Colon v Aetna Life & Cas. Ins. Co., 66 NY2d 6, 8). An insurer must defend whenever the four corners of the complaint suggest — or the insurer has actual knowledge of facts establishing — a reasonable possibility of coverage (Fitzpatrick v American Honda Motor Co., 78 NY2d 61, 66-67; Seaboard Sur. Co. v Gillette Co., 64 NY2d 304, 311-312). The duty is broader than the insurer’s obligation to indemnify: "[t]hough policy coverage is often denominated as liability insurance’, where the insurer has made promises to defend It is clear that [the coverage] is, in fact, "litigation insurance” as well.’ ” (Seaboard Sur., 64 NY2d, at 310, supra.) Applying these established principles, we conclude that CNA must defend its insured in the asbestosrelated actions.
II.
We first address whether the underlying complaints allege an "occurrence” covered by the CNA policies. Prior to 1966, the standard CGL policy provided coverage for injury "caused by accident.” The insurance industry changed to occurrence-based coverage in 1966 to make clear that gradually occurring losses would be covered so long as they were not intentional. Thus, "occurrence” was defined to include "continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected or intended from the standpoint of the insured.” (Olin Corp. v Insurance Co., 762 F Supp 548, 556 [SD NY], affd 966 F2d 718 [2d Cir]; Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo LJ 1237, 1241-1251 [1986].) The definition of occurrence in the CNA policies is a later version of this standard clause — "continued or repeated exposure to conditions which unexpectedly or unintentionally results during the policy period in Bodily Injury” — with substantially the same meaning (Olin Corp., 762 F Supp, at 562-564, supra).
CNA argues that the underlying complaints allege no "occurrences” covered by the CNA policies, that it therefore has *649 no indemnity liability and thus no duty to defend. This argument has two parts. First, CNA contends, the asbestos contamination alleged in the underlying suits was not "unexpected or unintentional.” Second, if there were occurrences, by Rapid’s own practical construction, they were not within the CNA policy periods. We disagree with both contentions and conclude the underlying complaints allege covered occurrences that trigger CNA’s duty to defend.
A.
For an occurrence to be covered under the CNA policies, the injury must be unexpected and unintentional. We have read such policy terms narrowly, barring recovery only when the insured intended the damages. Resulting damage can be unintended even though the act leading to the damage was intentional (McGroarty v Great Am. Ins. Co., 36 NY2d 358, 364; see also, Miller v Continental Ins. Co., 40 NY2d 675). A person may engage in behavior that involves a calculated risk without expecting that an accident will occur — in fact, people often seek insurance for just such circumstances (Allstate Ins. Co. v Zuk, 78 NY2d 41, 46; see also, City of Johnstown v Bankers Std. Ins. Co., 877 F2d 1146, 1150 [2d Cir] [ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage]).
CNA urges that Rapid is collaterally estopped from contesting intent to cause injury by an assortment of punitive damage judgments against Celotex, another successor to the Philip Carey asbestos business. Several juries have awarded punitive damages against Celotex based upon findings that Philip Carey’s actions were heedless, reckless, wanton, intentional, oppressive, willful, malicious, or in wanton or reckless disregard for the rights of others.
Collateral estoppel permits the determination of an issue of fact or law raised in a subsequent action by reference to a previous judgment on a different cause of action in which the same issue was necessarily raised and decided (Gramatan Home Investors Corp. v Lopez, 46 NY2d 481, 485). In addition to identity of issues — a factor not necessarily met here — the party seeking the benefit of collateral estoppel must show that the party to be estopped had a full and fair opportunity to contest the dispositive decision, or was in privity with one who did (id., at 485-486).
The lawsuits cited by CNA, however, all involve punitive *650 damage judgments against Celotex, not Rapid. Rapid was not a party to or involved in the defense of those actions, and could only be estopped if it were in privity with Celotex.
Rapid and Celotex have no common ownership. Through a series of complex corporate mergers prior to 1972, Celotex and Rapid each succeeded to the asbestos liability of Philip Carey. However, mere succession to the same potential liability does not place two corporations in privity with one another. Absent some obligation of Rapid to Celotex or common financial interest, Rapid does not have the requisite interest in the judgments against Celotex for privity between the two corporations (see, e.g., Green v Santa Fe Indus., 70 NY2d 244, 253-254).
Having presented no uncontested evidence other than the Celotex verdicts to demonstrate the asbestos injuries were expected or intended, CNA has failed to "establish as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision” (Allstate Ins. Co. v Zuk, 78 NY2d, at 45, supra).
B.
CNA next contends that the underlying lawsuits do not involve occurrences "during the policy period” — 1971 through 1979. Specifically, CNA argues that for a number of years Rapid conducted its insurance program under the theory that asbestos injury occurs upon discovery, or manifestation, of disease; that Rapid is now bound by this "practical construction;” and that, applying a manifestation theory, none of the underlying suits were triggered between 1971 and 1979.
The question of what event constitutes "bodily injury” sufficient to trigger coverage under the standard form CGL policy, where latent injury is caused by prolonged exposure to a toxic substance such as asbestos, has been hotly contested over the past decade. (See generally, Asbestos Ins. Coverage Cases in San Francisco Superior Ct., Judicial Council Coordination Proceeding No. 1072 [Phase III, Jan. 24, 1990]; Comment, Insurance Coverage of Asbestosis Claims — Running for Cover or Coverage, 32 Emory LJ 901 [1983]; Note, The Calculus of Insurer Liability in Asbestos-Related Disease Litigation: Manifestation + Injurious Exposure = Continuous Trigger, 23 BC L Rev 1141 [1982].)
Decisions on when coverage is triggered for asbestos-related *651 injury generally may be divided into four categories: (1) on exposure to asbestos (see, e.g., Commercial Union Ins. Co. v Sepco Corp., 765 F2d 1543 [11th Cir]); (2) on manifestation of disease (see, e.g., Eagle-Picher Indus, v Liberty Mut. Ins. Co., 682 F2d 12 [1st Cir], cert denied 460 US 1028); (3) on onset of disease, whether discovered or not ("injury-in-fact”) (see, e.g., American Home Prods. Corp. v Liberty Mut. Ins. Co., 565 F Supp 1485 [SD NY], mod 748 F2d 760 [2d Cir]); and (4) all of the above — in other words, a "continuous trigger” (Keene Corp. v Insurance Co., 667 F2d 1034 [DC Cir], cert denied sub nom. Liberty Mut. Ins. Co. v Keene Corp., 455 US 1007). Federal courts have concluded that the "injury-in-fact” rule is most consistent with New York law (see, Abex Corp. v Maryland Cas. Co., 790 F2d 119, 121 [DC Cir]; American Home Prods. Corp., 748 F2d, at 765, supra; but see, American Motorists Ins. Co. v Squibb & Sons, 95 Misc 2d 222, 225 [applying manifestation test to DES-related injury]). No New York appellate court has determined the issue.
Applying an "injury-in-fact” test, which rests on when the injury, sickness, disease or disability actually began, Rapid contends that the asbestos injuries claimed in the underlying lawsuits could fall within the period covered by CNA, thus giving rise to CNA’s duty to defend. Significantly, CNA does not argue for a different test under New York law, but instead urges that Rapid has demonstrated its own "practical construction” that a covered event "occurs” upon manifestation of the disease by previously looking to National instead of CNA to defend asbestos suits where the manifestation of asbestosis occurred after 1979. Rapid disputes this characterization of its claims program, pointing out that it has made demands on CNA to defend many asbestos suits where manifestation occurred after 1979.
Evidence of practical construction may only be referenced where the policy provisions are ambiguous (Slatt v Slatt, 64 NY2d 966). If ambiguity exists, "[t]o show a practical construction * * * there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with knowledge thereof and acquiescence therein, express or implied, by the other.” (Niagara Falls Intl. Bridge Co. v Grand Trunk Ry. Co., 212 App Div 705, 710, mod on other grounds 241 NY 85; see also, City of New York v New York City Ry. Co., 193 NY 543.)
While both parties currently proffer the same occurrence *652 trigger — injury-in-fact—the long-simmering differences in fixing the timing of an occurrence evidence ambiguity in the clause. However, Rapid’s actions vis-á-vis National are irrelevant for the purposes of determining rights and obligations with respect to CNA. As the Appellate Division noted, "[t]he fact that Rapid called upon other insurance coverage issued [by National] or obtained indemnification elsewhere, cannot be considered a concession that would relieve CNA of their contractual responsibilities” (177 AD2d 61, 70). By claiming under other policies, Rapid has not by implication "claim[ed] as of right under [a] doubtful provision, coupled with knowledge thereof and acquiescence therein” with respect to the CNA policies.
Thus, we conclude that the underlying complaints allege an "occurrence” within the CNA policies. Neither CNA’s estoppel claim nor its assertion of practical construction is sufficient to avoid its duty to defend its insured.
III.
We next consider whether coverage would nonetheless be excluded by the policies’ "pollution exclusion.” To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case (Seaboard Sur., 64 NY2d, at 311, supra; Kratzenstein v Western Assur. Co., 116 NY 54, 59). CNA has not met that burden.
A pollution exclusion was required in all liability policies from 1971 through 1982 (see, former Insurance Law § 46 [13], [14]) to "assure that corporate polluters bear the full burden of their own actions spoiling the environment” (1971 McKinney’s Session Laws of NY, at 2633). Though the provision remains in use, since 1982 it has not been mandated because no payments were being made on such liabilities. Corporate polluters who could not insure themselves simply went out of business when the liability arose (1982 McKinney’s Session Laws of NY, at 2628-2629).
Our first step is to determine whether the pollution exclusion in the CNA policies is ambiguous as applied to claims for bodily injury sustained by persons working with or around asbestos products. Clauses can, of course, be ambiguous in one context and not another (compare, Hicks v American Resources Ins. Co., 544 So 2d 952, 954 [Ala] [exclusion not ambiguous as *653 to acids, alkalis and toxic chemicals], with Motion, Allen, & Williams v St. Paul Fire & Mar. Ins. Co., 347 So 2d 95, 99 [Ala] [exclusion is ambiguous with regard to "natural material”]).
CNA contends that Technicon Elecs. Corp. v American Home Assur. Co. (74 NY2d 66) and Powers Chemco v Federal Ins. Co. (74 NY2d 910) stand for the proposition that the pollution clause is "unambiguously plain and operative” for all purposes. This contention is erroneous. In Technicon, the insured was sued for "intentional, long-term discharge of toxic waste chemicals” from its manufacturing plant into Frontera Creek in Humacao, Puerto Rico (Technicon, 74 NY2d, at 71-72, supra). There was no question that the primary terms of the pollution exclusion applied; rather, the dispute centered on the "sudden and accidental” exception (Technicon, 74 NY2d, at 75, supra). In Powers, similarly, the insured was sued as a result of hazardous wastes leaching out of drums stored by the insured’s predecessor. Again, there was no doubt that pollutants had been discharged into land, triggering the pollution exclusion; the issue was whether such discharge was "sudden and accidental” as to the successor landowner (Powers, 74 NY2d, at 911, supra).
This case deals with a different question: whether the exclusion on its face would ever apply in the context of liability for disease contracted by exposure to asbestos products in a confined space, even indoors. Asbestos could certainly be an irritant, contaminant or pollutant of the type encompassed by the clause (see, e.g., Labor Law § 900 [asbestos defined as "known carcinogenic agent”]; 42 USC § 7412; 40 CFR 61.01; part 122, Appendix D, Table V [asbestos listed as "toxic pollutant”]; and 33 USC § 1317; 40 CFR 401.15 [asbestos is "toxic pollutant”]). We conclude, however, that the clause is ambiguous with regard to whether the asbestos fibers at issue —fibers inhaled by persons working closely with or suffering long-term exposure to asbestos products — were discharged into the "atmosphere” as contemplated by the exclusion.
CNA claims that any inhalation presupposes a discharge into the "atmosphere,” citing dictionary definitions of atmosphere such as "the air in any given space” (Webster’s New World Dictionary [2d coll ed 1976]). Rapid counters with other dictionary definitions: "the gaseous envelope surrounding the earth” (Random House Dictionary of the English Language [unabridged ed 1983]) and "the whole mass of air surrounding *654 the earth” (Webster’s Third New International Dictionary [unabridged ed 1983]). These differing definitions point toward ambiguity in the meaning of "atmosphere.”
Ambiguity is further revealed by examining the purpose of the clause, meant to exclude coverage for environmental pollution (see, West Am. Ins. Co. v Tufco Flooring E., 104 NC App 312, 323, 409 SE2d 692, review dismissed 332 NC 479, 420 SE2d 826). The terms used in the exclusion to describe the method of pollution — such as "discharge” and "dispersal”— are terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste (see, Atlantic Mut. Ins. Co. v McFadden, 413 Mass 90, 595 NE2d 762). Further, the three places for discharge contemplated by the policy exclusion — into or upon land, the atmosphere, or any water course or body of water — read together support the conclusion that the clause was meant to deal with broadly dispersed environmental pollution — "exposure to chemical carcinogens in the ambient atmosphere”— not the possibly confined environs of the present complaints. (See, National Std. Ins. Co. v Continental Ins. Co., US Dist Ct, ND Tex, Oct. 4, 1983, Hill, J.; see also, Stonewall Ins. Co. v National Gypsum Co., 1992 US Dist LEXIS 7607, 1992 WL 123144 [SD NY, May 27, 1992, 86 Civ 9671]; United States Fid. & Guar. Co. v Wilkin Insulation Co., 144 111 2d 64, 79-80, 578 NE2d 926, 933; Asbestos Ins. Coverage Cases in San Francisco Superior Ct., Judicial Council Coordination Proceeding No. 1072, at 18 [Phase IV, Jan. 24, 1990]; Note, The Pollution Exclusion in the Comprehensive General Liability Insurance Policy, 1986 U 111 L Rev 897, 938.) The crucial distinction, therefore, is not whether the asbestos products were launched into the stream of commerce or remained under the control of the manufacturer, but rather whether asbestos was placed into the environment.
Even if the word "environment” encompassed all areas through which asbestos passes, the asbestos fibers in the underlying complaints could well have been transmitted by direct contact with hands or clothing (see, e.g., Dube v Pittsburgh Corning, 870 F2d 790, 791). Thus, CNA has not demonstrated that the injuries alleged in the suits occurred solely through asbestos contamination of air. Where contamination could occur in a variety of ways, only one of which is potentially excluded, CNA cannot meet the heavy burden of showing that the exclusion applies in the particular case and is subject to no other reasonable interpretation (Seaboard Sur., *655 64 NY2d, at 311, supra), and it therefore must defend its insured.
Rapid additionally argues that CNA should be bound by its own "practical construction” that the clause does not apply, pointing to CNA’s prior defense of many asbestos suits on behalf of Rapid over a period of 16 years despite pollution exclusion clauses. In that CNA disputes defending such actions, this question cannot be resolved on summary judgment. We note, however, that such defense, if proven, would provide another ground for requiring CNA to defend in the instant underlying litigations.
We thus conclude that since the pollution exclusion is ambiguous in these circumstances and could be construed against the insurer-drafter and in favor of potential coverage for the policyholder, CNA cannot escape its duty to defend.
IV.
Finally, CNA urges that if any obligation to defend exists, National and Rapid itself should have to contribute pro rata to defense costs — National because it was the insurer after 1979 and Rapid because it allegedly "went bare,” or was self-insured, for some periods prior to 1971.
We agree with the Appellate Division that the question whether CNA had a claim for contribution against National is premature. National may eventually have to contribute both to defense costs and to indemnification (Federal Ins. Co. v Atlantic Natl. Ins. Co., 25 NY2d 71; see also, Uniroyal, Inc. v Home Ins. Co., 707 F Supp 1368, 1391 [allocating insureds’ "net loss” among insurers — and insured to extent self-insured —after settlement of underlying litigations]). However, the duty to defend is broader than the duty to pay, requiring each insurer to defend if there is an asserted occurrence covered by its policy (Cordial Greens Country Club v Aetna Cas. & Sur. Co., 41 NY2d 996), and the insured should not be denied initial recourse to a carrier merely because another carrier may also be responsible (Squibb & Sons v Accident & Cas. Ins. Co., 1992 US Dist LEXIS 6255, 1992 WL 133899 [SD NY, Apr. 21, 1992, 82 Civ 7327]). That is the "litigation insurance” the insured has purchased (Servidone Constr. Corp. v Security Ins. Co., 64 NY2d 419, 424-425). When more than one policy is triggered by a claim, pro rata sharing of defense costs may be ordered, but we perceive no error or unfairness in declining to order such sharing, with the understanding that the insurer *656 may later obtain contribution from other applicable policies (see, Asbestos Ins. Coverage Cases in San Francisco Superior Ct. [Phase IV], at 41-42, supra; see also, Avondale Indus, v Travelers Indent. Co., 887 F2d 1200, 1207 [2d Cir], cert denied 496 US 906).
Similarly, the allegation that Rapid was self-insured for a period of time predating the CNA coverage cannot operate to deny Rapid the complete defense to which it is entitled under the CNA policies in the event of overlapping occurrence periods. The question whether the insured itself must contribute to defense costs — an issue on which courts have divided (compare, Keene Corp. v Insurance Co., 667 F2d 1034, 1050-1051 [DC Cir], supra, with Insurance Co. v Forty-Eight Insulations, 633 F2d 1212, 1224-1225 [6th Cir]) — is appropriately deferred at least until such time as the underlying lawsuits are shown to involve "occurrences” during self-insured periods. In any event, issues of fact concerning whether Rapid was self-insured for any period make this determination inappropriate for summary judgment.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
Acting Chief Judge Simons and Judges Titone, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
Order affirmed, etc.