OPINION OF THE COURT
Gerard M. Weisberg, J.
In this third-party declaratory judgment action, third-party claimant, the City University of New York (CUNY), moves for partial summary judgment against third-party defendant United States Fidelity and Guaranty Company (USF&G) declaring that the latter must defend the former with respect to the acts alleged in the underlying claim. USF&G cross-moves for summary judgment dismissing the third-party claim.
From the papers it appears that in 1942 a structure referred to as "Roosevelt House” was deeded by another organization to the Hunter College Student Social Community & Religious Clubs Association (Association), a not-for-profit corporation. The House was thereafter used by the Association and by Hunter College, which is a senior institution of CUNY, for extracurricular activities.
On or about July 1, 1989, USF&G issued a general liability insurance policy which named as its insureds "Hunter College of the City University of New York” and the Association for the period from July 1, 1989 to July 1, 1990. The policy provides, among other things, that USF&G "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury’ * * * to which this insurance applies,” and provides further that USF&G has the duty to defend the insureds against any suit seeking such damages.
From August 10, 1987 to December 12, 1989, Caryn Oates served as the custodian of Roosevelt House. Whether she was an employee of the Association is unclear; however, it is admitted that she was an employee of Hunter College. In either event, Mrs. Oates worked approximately 35 hours per *620 week as the custodian. She also resided in a six-room apartment in Roosevelt House together with her husband and daughter, Kristen. Her second daughter, Meagan Lynn, was born on or about December 1, 1989, apparently immediately after the family’s departure from Roosevelt House. The claim alleges physical injury to Meagan Lynn resulting from lead poisoning due to the defendants’ negligent failure to remove lead paint from the Roosevelt House apartment and/or to have warned of its dangers.
For its fourth point, USF&G asserts there is no insurance coverage by virtue of an "absolute” pollution exclusion provision of the policy. The language in question provides that:
"This insurance does not apply to:
"(1) 'Bodily injury’ or 'property damage’ arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
"(a) At or from premises you own, rent or occupy * * *
"Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.” (Section l.A.2.f.)
USF&G, relying on the apparently plain meaning of this language, argues that lead poisoning resulting from lead-based paint from the apartment walls, as alleged in the claim, constitutes an excluded bodily injury resulting from, inter alla, a release of a pollutant. In opposition, CUNY argues:
(i) that pursuant to Continental Cas. Co. v Rapid-Am. Corp. (177 AD2d 61, affd 80 NY2d 640) and similar non-New York cases, the pollution exclusion provision applies only to intentional environmental pollution and not to, as here, a negligent on-premises injury;
(ii) that even if the exclusion applies to unintentional on-premises pollution, the definition of "pollutant” is ambiguous and does not include lead or paint; and
(iii) there is no allegation that CUNY polluted the Roosevelt House apartment but only that it failed to remove the paint and/or warn of its dangers thereafter.
We start from the proposition that the duty to defend is broader than the obligation, to indemnify (Technicon Elecs. Corp. v American Home Assur. Co., 74 NY2d 66) and is derived from the allegations of the claim and the terms of the policy. "If the [claim] contains any facts or allegations which bring *621 [it] even potentially within the protection purchased, the insurer is obligated to defend.” (Technicon Elecs. Corp. v American Home Assur. Co., supra, at 73.) Moreover, where, as here, an exclusion is relied on, the insurer must demonstrate that the allegations, in toto, are subject to no other interpretation than that which falls within the exclusion. (Technicon Elecs. Corp. v American Home Assur. Co., supra.) With that in mind we shall address CUNY’s arguments seriatim.
In Continental Cas. Co. v Rapid-Am. Corp. (177 AD2d 61, affd 80 NY2d 640, supra), a worker suffered asbestos poisoning and the insurer disclaimed coverage pursuant to a pollution exclusion provision. The language there, however, provided that coverage did not apply: " 'To personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.’ ” (Continental Cas. Co. v Rapid-Am. Corp., 177 AD2d, at 66-67, affd 80 NY2d 640 [emphasis added].)
After assuming that asbestos was a pollutant within the meaning of this provision, the Appellate Division went on to analyze the provision in light of the legislative history of the clause in New York. That tribunal noted that in 1971 the insurance law was amended to provide that insurance companies could not insure intentional industrial polluters: the theory being that the absence of the availability of insurance would discourage pollution. (See, Governor’s Mem approving L 1971, ohs 765, 766, 1971 McKinney’s Session Laws of NY, at 2633.) Since the legislative intent was only to discourage intentional environmental pollution, and the policy language tracked the statutory language, the Appellate Division concluded that the provision was only intended to exclude coverage for intentional environmental pollution, and not "to effect a total obliteration of negligence and/or product liability coverage whenever a tangential impact on any 'environment’ is involved.” (Continental Cas. Co. v Rapid-Am. Corp., 177 AD2d, at 69-70, affd 80 NY2d 640, supra; see also, Consolidated Am. Ins. Co. v Ivey’s Steel Erectors, US Dist Ct, MD Fla, Mar. 11, 1991, Fawsett, J.)
After the submission of these motions, Continental (supra) was affirmed by the Court of Appeals (80 NY2d 640). That *622 Court, after noting that a clause could be ambiguous in one context and not in another, held the Continental clause to be ambiguous with respect to asbestos fibers which were discharged indoors. This finding resulted, however, from the clause’s reference to the excluded discharge being "into or upon land, the atmosphere or any water course or body of water.” (Supra, at 647.) To the Court of Appeals this language confirmed what the Appellate Division had held, to wit, "that the clause was meant to deal with broadly dispersed environmental pollution” (supra, at 654) and not within-premises contamination.
The aim and goal of discouraging intentional pollution by a lack of insurance availability, however, never converged, the result being that uninsured polluters went bankrupt or disappeared leaving no one to answer financially for the cleanup. Therefore in 1982, the insurance law was again amended, this time to remove the prohibition to coverage that the prior amendment had inserted. (L 1982, ch 856.) Thus, as of that date, insurance companies were free to write, or not to write, insurance coverage for polluters. (See, Governor’s Mem approving L 1982, ch 856, 1982 McKinney’s Session Laws of NY, at 2628.)
Not surprisingly, many insurance policies were then redrafted. However, not only did they take out the "sudden and accidental” language, but they also removed the reference to "land,” "atmosphere,” and "body of water” substituting "at or from premises you own, rent or occupy.” These are now referred to as "absolute” pollution exclusion provisions. Cases subsequent to Continental (supra), when confronted with this exclusionary language, have held that the only reasonable interpretation is that it " 'is just what it purports to be— absolute’ ” (Budofsky v Hartford Ins. Co., 147 Misc 2d 691, 695, quoting Alcolac Inc. v California Union Ins. Co., 716 F Supp 1546, 1549 [D MD 1989]) and it excludes any and all personal injuries resulting from pollutants released at or from the insured’s premises whether intentional or not. In all candor, we cannot imagine a more unambiguous statement of intent than, after being told by the courts that "land, atmosphere and water course” imply industrial pollution, to replace such language with "premises you own, rent or occupy.” In the absence of an ambiguity we cannot rewrite the policy to suit CUNY and hold the Continental result to be inapplicable to the instant matter.
CUNY counters that such an interpretation renders the *623 policy illusory and is necessarily ambiguous. Virtually any substance, it argues, can be an "irritant” or a "waste product” (see, section l.A.2.f. [2] of the insurance policy) under some circumstances. Thus, it posits, scalding water from a faucet can irritate, spoiled food can poison, or trash (i.e., waste paper) on a stairway can cause a fall. Therefore, CUNY concludes, USF&G’s interpretation would exclude from coverage even the most elementary slip and fall and products liability cases that all reasonable minds would agree must have been intended to be covered.
We think CUNY’s point is well taken to the extent that if the exclusion’s language is read literally and out of context it may render the policy illusory. Be that as it may, and construing any ambiguities against the draftsman as we must (Muhlstock & Co. v American Home Assur. Co., 117 AD2d 117), we cannot ignore the policy’s language, nor read it out of context. (Continental Cas. Co. v Rapid-Am. Corp., 80 NY2d 640, supra; accord, Guilford Indus. v Liberty Mut. Ins. Co., 688 F Supp 792, affd without opn 879 F2d 853 [1st Cir 1989].) Water, food and trash are neither specifically listed in the policy’s definition of pollutants, nor are they generally understood to be such in ordinary usage. We therefore interpret the language to exclude coverage if, but only if, personal injury resulted from a poisoning, internal or external, caused by a chemical or chemical-like substance contained in the definition of pollutants or similar to those listed.
Inasmuch as the injury here resulted from an alleged poisoning, the next question becomes whether lead paint is a pollutant within the definition. CUNY argues that it is not because neither lead nor paint nor lead paint are specifically listed in the definition section of the policy as pollutants. (See, Atlantic Mut. Ins. Co. v McFadden, 413 Mass 90, 595 NE2d 762.) It is indisputable, however, that lead paint is a chemical and a contaminant that can irritate or poison, is illegal (Public Health Law §§ 1370, 1372), and falls within the general tenor of the specifically listed pollutants. Moreover, what would CUNY have USF&G do: list every harmful chemical known to man in the definition section. At some point, reality must be incorporated by reference. We therefore find that the injuries in the claim alleged to have resulted from lead paint poisoning fall within the exclusionary provision.
Lastly, CUNY, relying on Niagara County v Utica Mut. Ins. Co. (80 AD2d 415), argues that the exclusion does not apply because it is only alleged to have failed to remove the paint *624 and/or to not have warned of its dangers, but not to have personally applied the paint to the apartment — the language of the policy only prohibiting the last of the three. Niagara, however, involved the same limited pollution exclusion as Continental (supra) rendering its application suspect. More to the point, we think is Matter of Duncan Petroleum Transp. v Aetna Ins. Co. (96 AD2d 942, affd on opn below 61 NY2d 665).
In Duncan (supra), the policy excluded coverage for "damages arising out of the ownership, maintenance, operation, use, loading or unloading” of Duncan vehicles. The underlying claim arose as the result of an explosion during the transfer of gasoline from a Duncan tractor-trailer. The Court, in noting that Duncan sought to avoid the impact of the clear expansive exclusion in the policy by attributing alleged nonexcluded factors as causes of the accident, stated: "Duncan claims that the accident was caused by such factors as, inter alla, a failure to inspect the vehicles, a failure to train and supervise personnel, the use of dangerous procedures for the transfer of gasoline, and improper maintenance and design of the vehicles. Nothing about the foregoing asserted factors, even if they were actually involved in causing the explosion, would negate the unequivocal and unchallenged fact that the accident arose out of the loading or unloading of the automobile. Duncan’s factors of causation serve to do no more than provide reasons or subfactors explaining why the accident arose out of the loading or unloading of the vehicle. Acts or omissions which predated the loading operation but which allegedly brought about the explosion during the loading do not prevent invocation of the exclusion clause. Whatever the originating reason for the explosion, it arose out of the use of the vehicles while they were being loaded.” (Matter of Duncan Petroleum Transp. v Aetna Ins. Co., 96 AD2d 942, 943, supra; see also, O’Connor v City of New York, Sup Ct, Bronx County, Dec. 18, 1989, Silver, J.)
So too here, the allegation that the claimants were damaged by lead poisoning resulting from lead paint in Roosevelt House necessarily implies that they were damaged by the release of lead, a pollutant, on, or in, or from CUNY’s premises, which is exactly the excluded event. That the injury may have also happened because CUNY did not remove the paint of warn of its dangers does no more than explain why it may be responsible for the damages. (See, Brown v Marathon Realty, 170 AD2d 426.) It does not change the fact that those *625 damages arose, allegedly, from a release. It does not, therefore, avoid the exclusion.
For its fifth point, USF&G asserts that there is no coverage under the policy because the claim falls within the "employment exclusion.” This provision provides that the insurance does not apply to bodily injury to:
"(1) An employee of the insured arising out of and in the course of employment by the insured; or
"(2) The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.”
In response, CUNY first argues that this provision was intended only to exclude derivative claims by relatives of an employee injured within the course of his or her employment. The problem with this interpretation is that the type of injury explicitly excluded by this language is "[b]odily injury” to the relative. Bodily injury is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.” Clearly nonphysical, economic injury is not what is being referred to here. Since derivative claims are by nature nonphysical, the exclusionary language could not be referring to them. The only other interpretations available are what the language appears to say, to wit, that where an enumerated relative of an employee suffers bodily injury the relative’s injury will not be covered where either such injury resulted from the employment or from the employee’s injury arising out of the employment. CUNY responds that the provision is therefore ambiguous in that it is unclear whether the exclusion is for a relative’s injury resulting from the employee’s injury or resulting from the employee’s employment without regard to the employee’s injury. While we agree that there exists more than one reasonable construction of this language, since under either interpretation the underlying claim would be excluded, the ambiguity is of no significance.
There is no dispute that Mrs. Oates lived and worked in Roosevelt House as an employee/custodian for CUNY. There is also no dispute that she was allowed to live in the apartment in Roosevelt House as a benefit of her employment and that Meagan Lynn is alleged to have been injured in útero while her mother lived and worked in Roosevelt House. Therefore any lead poisoning which Meagan Lynn suffered while Mrs. Oates worked in Roosevelt House as a custodian is a bodily injury which arose out of her mother’s employment. *626 Moreover, inasmuch as she was in útero during the alleged poisoning, we fail to see how she could have been injured without her mother having been subjected to the same poisonous condition, and her body serving, albeit involuntarily, as a conduit therefor. A fortiori, Meagan Lynn’s bodily injury resulted as well from her mother’s injury.
Moreover, while the claimants were present in Roosevelt House at times in addition to those when Mrs. Oates was working there, where an employer provides living accommodations on the premises as part of the employment agreement, a presumption exists that any injury to the employee on the premises arises out of and in the course of the employment. (Matter of Torres v Laurel Hill Nursery, 98 AD2d 904, affd on opn below 64 NY2d 895.) Therefore, any lead poisoning Mrs. Oates suffered at Roosevelt House is presumed to have incurred within the course of her employment. As Meagan Lynn was in útero over the same time period, her alleged bodily injury resulted from her mother’s employment and/or her mother’s injury within the scope of her employment. In either case, the claim is excluded from coverage under the policy.
[Portions of opinion omitted for purposes of publication.]