**OSNAT GAD, INC. a/k/a OGI, Ltd. a/k/a OGI Wedding Bands Limited, Plaintiff,**

v.

**THOSE LEAD UNDERWRITERS OF INTEREST AT NAVIGA SA and other subscribing Underwriters with Interest to Confirmation of Insurance No. 6606, Defendants.**

No. 04 Civ. 2305LLS.

United States District Court, S.D. New York.

March 2, 2005.

Patrick James Corbett, Badiak Will & Ruddy, LLP, New York, NY, for defendant.

## Opinion and Order

STANTON, District Judge.

Plaintiff Osnat Gad, Inc. seeks compensation from defendant insurance interests for jewelry stolen while in the custody of plaintiff's employee. Defendants move under Fed R. Civ. P. 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, and under Fed R. Civ. P. 12(c) for judgment on the pleadings. Defendants also move for a default judgment on their counterclaim.

### 1. The February 28, 2003 Loss of the Jewelry

Plaintiff employed Steven Traver as a salesperson for its jewelry line. One of his responsibilities was to travel to jewelry stores in order to demonstrate plaintiff's line of jewelry. According to Mr. Traver's April 16, 2003 statement, at 10:30 A.M. on February 28, 2003, he visited a store in Houston called Tootsies. Following that appointment:

> I then drove to Charde on Kirby Blvd. I believe I arrived about noon. I parked in front of the store in the parking area near the road facing out. I then went into the store leaving my line of jewelry in the rear cargo area of my Lexus S.U.V. I said Hi to everyone in the store and I was waiting for the owner Cliff Hybarger to finish with a customer. I was in the front of the store looking out. I was going to ask Cliff to come outside with me to bring in the jewelry line. I felt I was being followed but didn't specifically see another car enter the parking lot with me. I did take several extra turns before going to Charde. I had been in the store 5–10 minutes when a blue van pulled in facing south and stoped [sic] between my car & Charde blocking my view. I then saw the handle of one of my bags being lifted on the other side of the van. I ran outside as the van & an old sedan sped out of the parking lot heading south. The owner immediately called the police. They arrived in 2–3 minutes.

(November 23, 2004 Affidavit of Patrick J. Corbett, Ex. D).

In a March 3, 2003 e-mail, Mr. Traver described the incident further:

> I drove over to Charde and started getting the feeling that I was being followed. Every car I saw was full of Latin looking men who looked menacing. I think that maybe I was being paranoid but so many people had warned me about how dangerous Houston was that I was freaking out as I watched ten year old Oldsmobiles and other sedans in my rear view mirror. I'm not sure whether I saw the perpetrators or not but I thought that I was being followed along Kirby Street as I traveled south to Charde.
>
> When I pulled up to the store I was getting our [sic] of the car and could see that Cliff Hybarger was clearly visible in the store along with two female associates. I was thinking about Jolene's telling me about friends of hers who were yanked out of their car in Houston in a theft and I thought that I shouldn't be sitting in the car. But I also didn't want to open the back of the car and get the

line out as I felt for sure that it would be yanked as soon as I opened the trunk and that I'd be shot or pistol whipped if that were to happen. My car was maybe 15 feet from the store and clearly in view. I fled to the store to isolate myself from the situation and figured I'd wait a minute and see what happened and then ask Cliff to walk me to the car to retrieve the line.

I kept my eyes on the car the entire time and felt that I was doing the smart thing. But before Cliff was finished with his customer I watched the Colombians pull up and smash my windows. This was within a couple of minutes of my stopping. Unfortunately there was nothing I could do at that point; I ran towards the car at that point, probably stupid for me to do so, but I did run for the car. Lucky for me that I didn't get shot then but I did get a view of the van and the sedan pulling out of the parking lot and down Kirby Street.

It happened so quick that I'm sure that they were right behind me. I'm sorry that the line got stolen but I feel that if I hadn't gotten away I would have been assaulted.

(January 10, 2005 Affirmation of Martin I. Nagel, Ex. A).

The police apprehended three suspects a short distance from the scene of the crime, but did not recover the jewelry. Sgt. Macha of the City of West University Place police recorded a discussion with Houston PD Sgt. Terry Scoggins about the theft in the police report:

Scoggins told me the suspects are part of Colombian organized crime and they steal to make money for terrorist organizations in Colombia. There are training camps set up in Colombia and also safe houses in every major city in America. Jewelry salesmen are the usual targets. Scoggins told me the Colombi-ans travel with several cars and communicate with the cellular phones and walkie-talkies. They follow jewelry salesmen all over the place and pick just the right time to commit the theft or robbery. Scoggins said they are very well trained, organized and very dangerous.

(Corbett Affidavit, Ex. H, p. 3).

Following the theft, plaintiff submitted a claim for the value of the stolen goods to defendants, its insurance carriers. Defendants denied coverage, claiming the jewelry was not in the "close personal custody and control" of plaintiff's employee while in transit, and that coverage was excluded when he was not actually in the vehicle with the jewelry at the time of the loss.

## 2. The Insurance Policy

The insurance policy at issue states in relevant part:

Against all risks of Physical Loss or Damage to the subject matter insured from any cause whatsoever subject to Conditions, Exclusions and Clauses stated hereafter.

\*     \*     \*     \*     \*     \*

*Personal Conveyance Clause*

This Policy only covers the Insured interest in transit when in the close personal custody and control of the assured and/or assured's employee(s) and/or representative(s) at all times whilst in transit subject to hotel/motel clause, excluding all losses due to infidelity.

\*     \*     \*     \*     \*     \*

### EXCLUSIONS

Notwithstanding anything contained elsewhere herein this policy does not cover loss and/or damage resulting directly or indirectly from any of the following:

\*     \*     \*     \*     \*     \*

7. Loss of or damage to property while in or upon any automobile, motorcycle, or any other vehicle unless, at the time the loss or damage occurs, there is actually in or upon such vehicle, the Assured, or a permanent employee of the Assured, or a person whose sole duty it is to attend the vehicle, except as may be endorsed hereon....

(November 23, 2004 Aff. of Patrick J. Corbett, Ex. C, pp. 3, 6, 13–14).

### 3. The Application of Exclusion 7

Mr. Traver, the employee responsible for the insured jewelry, left the jewelry in his vehicle and entered the store of a client, just before the thieves broke into his vehicle and removed the jewelry. Thus, he was not (in the words of the exclusion) "in or upon such vehicle" at the moment the thieves took the jewelry into their hands. However, plaintiff alleges that Mr. Traver left the vehicle because he suspected that a robbery was imminent, feared that he would be in physical danger if he remained in the vehicle, and "felt for sure" that he'd be shot or pistol-whipped if he opened the car's trunk to take the samples with him.

A narrow construction of the clause "the time the loss or damage occurs" would hold that it occurred only at the moment the jewelry was physically seized by the thieves. Under that interpretation, the employee would forfeit coverage unless he stayed in the vehicle until the jewelry was stolen. Another interpretation would allow that "the time the loss or damage occurs" refers to the whole course of the robbery, including (as plaintiff urges) the time when the robbers were following the salesman while he and his jewelry were both in the car, and made him "reasonably fearful for his personal safety, if not for his life." (January 6, 2005 Affidavit of Osnat Gad, para. 11). Plaintiff, based on over

twenty years' experience in the jewelry industry, argues the latter construction is the more reasonable. *Id.* at ¶¶ 7, 12 ("I never expected that coverage could be denied unless the salesmen were willing to protect the merchandise with their lives in the course of a robbery").

### 4. Legal Principles

"To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Continental Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 972, 609 N.E.2d 506, 512 (1993) (citation omitted). "If there is ambiguity in the terminology used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury." *Hartford Acc. & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973) (citation omitted). "An exclusionary clause, moreover, can be ambiguous in one context and not in another." *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34, 37 (2d Cir.1995).

Plaintiff's construction of the phrase "the time the loss or damage occurs" as comprehending the whole course of the robbery is not so unreasonable that one can rule as a matter of law that it is unmistakably inapplicable. Construing "the time the loss or damage occurs" to refer only to the moment of seizure, with its concomitant requirement that the salesman must not leave the car for his personal safety, may be a harsher interpretation than the parties, or industry practice, foresaw. These issues must be resolved by trial.

*Conclusion*

Defendants' motion for judgment on the pleadings, or to dismiss the complaint for failure to state a claim upon which relief can be granted, is denied.

Defendants' motion for a default judgment on its counterclaim is also denied. The claims in the counterclaim are mere reciprocals of those in the complaint, and accordingly must be tried on their merits.

So ordered.