**Edgar GLUCK, et. al., Plaintiffs,**

v.

**EXECUTIVE RISK INDEMNITY, INC., Defendant.**

**Civil Action No. CV–07–4562(DGT).**

United States District Court, E.D. New York.

Jan. 22, 2010.

Howard Kleinhendler, Meagan A. Zapotocky, Wachtel & Masyr, LLP, New York, NY, for Plaintiffs.

Thuy Trang Bui, Drinker Biddle & Reath LLP, New York, NY, Janet R. McFadden, Drinker Biddle & Reath LLP, Washington, DC, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, J:

This case arises out of a dispute regarding control over Northern Services Group ("NSG"). NSG is a non-profit corporation that manages nursing homes and assisted living facilities. It is associated with a religious congregation known as Chevre Liady Nusach Hoary ("Chevre"). Plaintiffs believe they were improperly expelled from the board of NSG after NSG settled a dispute over its non-profit status with the IRS. This expulsion generated two law suits and a counterclaim, all in state court ("the underlying actions").

Defendant Executive Risk Indemnity, Inc. ("Executive Risk") insured NSG and its board members as part of a directors, officers and trustees liability policy ("DO & T policy"). As part of this policy, Executive Risk is responsible for the legal defense costs of current and former board members of NSG so long as certain criteria are met. The plaintiffs claimed coverage for the costs they have incurred and will incur related to the underlying actions but Executive Risk denied their requests for coverage. In this action, plaintiffs sue for a declaratory judgment to the effect that Executive Risk must cover their defense costs for the underlying actions, among other things.

Defendant has moved for summary judgment, requesting a declaration that it is not required cover plaintiffs' defense costs. Plaintiffs have cross moved for summary judgment and request a declaration that defendant is required to cover their defense costs. For the reasons stated below, defendant's motion for summary judgment is granted and plaintiffs' motion is denied.

## Background

### (1)

### The Closing Agreement between NSG and the IRS

NSG is a non-profit corporation organized to manage various nursing homes and assisted living facilities. Def. Ex. 7 at 1. NSG was originally founded as a not-for-profit corporation without any members. Def. Ex. 19 at 6. However, Chevre maintains that in 2004, NSG's bylaws and certificate of incorporation were amended to install Chevre as the sole member of NSG. *Id.* at 6–9. As explained further below, several board members dispute whether Chevre continues to be a voting member of NSG following further amendments to NSG's bylaws in 2006. *Id.*

In any event, as of 2004, NSG was a tax-exempt non-profit under 26 U.S.C. § 501(c)(3). *See* Def.'s Rule 56.1 Statement ("Def. 56.1 St.") ¶ 4; Pl.'s Rule 56.1 Statement ("Pl. 56.1 St.") ¶ 4. The IRS, however, revoked this status in 2005 and NSG challenged this revocation in federal court that July. Def. 56.1 St. ¶ 4–5; Pl. 56.1 St. ¶ 4–5.

Rather than litigate the dispute, the IRS and NSG decided to settle the matter and agreed on terms (the "Closing Agreement"). Def. Ex. 6. Under the Closing Agreement, the IRS agreed that NSG would retain its § 501(c)(3) tax exempt status as a non-profit. *Id.* at 15. In re-

turn, NSG was obliged to enact governance reforms. *Id.* at 1–17. In particular, NSG agreed to change the composition of its board to ensure that eight of its thirteen directors were independent of Chevre and the Rabbi in charge of Chevre and had not been an officer or director of Chevre. *Id.* at 3. NSG also agreed to follow specified procedures in setting board member and executive compensation, including an independent audit to determine whether the existing compensation was reasonable. *Id.* at 9–12. The Closing Agreement was executed on April 7, 2006, and was signed by Morris Klein, NSG's Executive Director. *Id.* at 16–17.

(2)

### The Underlying Actions and the Demand for Coverage

About six months after the execution of the Closing Agreement, a battle for control of NSG erupted between Joseph Grunwald, then-Chief Financial Officer of NSG; Chevre, as NSG's sole member; and several NSG board members. In December 2006, this battle led to two legal actions implicating the insurance policy issued to NSG by Executive Risk. These actions, and the differing accounts of what led up to them, are described below.

### a. The First State Declaratory Judgment Action: *Chevre v. Grunwald*

In November 2006, Chevre, NSG and three putative board members (collectively "Chevre") filed suit in state court against Grunwald and nine individuals they alleged had been removed from NSG's board. *See* Def. Ex. 3 esp. ¶ 9–19 (hereinafter "*Chevre v. Grunwald*"). Chevre sought a declaratory judgment that the nine individuals were no longer NSG board members and

had no authority to act on behalf of NSG. *Id.* at ¶ 50. For ease of identification, this group of purportedly terminated board members will be referred to as the "Disputed Board Members." The facts listed in this section regarding the nature of the *Chevre v. Grunwald* dispute are taken from the complaint in that action.[1]

The complaint first explained the events leading up to NSG's settlement with the IRS. Prior to the suit, NSG's nonprofit, tax-exempt status had been repeatedly examined by the IRS, which had issued "adverse determination" letters. *Id.* at ¶ 23–33. Defendant Joseph Grunwald's actions were among the factors that caused the IRS to issue these adverse determination letters. *E.g., id.* at ¶ 23–24, 28, 32. Grunwald was attempting to have NSG's nonprofit status revoked so he could privatize it for his own benefit. *E.g., id.* at ¶ 29. After extended negotiations, NSG was able to resolve its disagreements with the IRS and entered into the Closing Agreement, which imposed "certain governance requirements" on NSG in exchange for retention of its non-profit status. *Id.* at ¶ 35.

In November 2006, following the execution of the Closing Agreement, Grunwald declared that he wanted to retire from his duties at NSG and demanded that his "equity" in NSG be bought out. *Id.* at ¶ 36. The complaint explains that the plaintiffs—presumably the NSG board members bringing suit and/or representatives of Chevre—responded that such a buyout would (1) violate New York law regarding non-profit corporations and (2) violate the Closing Agreement. *Id.* at ¶ 37–38. After this, Grunwald stacked the board with individuals who wanted to change NSG's charitable purpose—i.e., with the Disputed Board Members. *Id.* at ¶ 39. This stack-

---

1. As explained further *infra,* because the relevant legal standard for determining whether coverage exists centers on an analysis the four corners of each complaint/counterclaim, this background section focuses separately on the allegations contained in each.

ing resulted in a board that was not sufficiently independent and therefore violated the Closing Agreement. *Id.* at ¶ 40. Grunwald and the Disputed Board Members did this in order to cause NSG's tax exempt status to be revoked so that Grunwald could privatize the entities for his own benefit. *Id.* at ¶ 41.

Chevre then called a member meeting "to insure that the Board not take any action that would be in violation of its fiduciary duty to NSG's sole member [Chevre]." *Id.* at ¶ 42. At that meeting, Chevre used its authority as NSG's sole member to expel the Disputed Board Members. *Id.* at ¶ 44. However, the Disputed Board Members continued to attempt act on behalf of NSG, prompting Chevre to institute the declaratory action *Chevre v. Grunwald* to stop the Disputed Board Members from taking further actions that might harm NSG's not-for-profit status. *Id.* at ¶ 47, 49–50.

*Chevre v. Grunwald* was dismissed in December 2006 upon a finding that Chevre had failed to give adequate notice of the meeting where the Disputed Board Members were purportedly dismissed from the board. Pl. Ex. H at p. 2–3. Chevre then held another meeting and again dismissed the Disputed Board Members after providing notice. Def. Ex. 12 at p. 1.

**b. The Second State Declaratory Judgement Action:** *Gluck v. Chevre*

After Chevre's second meeting purporting to dismiss them, the Disputed Board Members filed suit in state court,[2] on behalf of NSG, against Chevre and NSG's Executive Director, Morris Klein, on or about January 10, 2007. Def. Ex. 4 at p. 1. The complaint in this second state court action, hereinafter "*Gluck v. Chevre,*" explained differently the dispute that transpired as a result of the Closing Agreement. The facts described below are taken from this complaint.

Contrary to the allegations in the *Chevre v. Grunwald* complaint that Grunwald purged NSG's board in order to have NSG's non-profit status revoked or his equity purchased, the *Gluck v. Chevre* complaint ascribed the changes in the composition of NSG's board and its bylaws to a desire to preserve NSG's non-profit status and comply with the Closing Agreement. It first recited the history of the Closing Agreement and emphasized the necessity of complying with it to preserve NSG's financial viability. Def. Ex. 4 at ¶ 4. It stated, "[w]ere the Company to default under the Closing Agreement and lose its federal not-for-profit status, it could not continue in business. First, it would owe more than $10 million in taxes. . . ." *Id.* at ¶ 26.

The complaint went on to explain that the Closing Agreement barred Chevre's active involvement in NSG. It stated that the IRS at one point—although the time and place are not specified—informed NSG in writing that Chevre "inserting itself as a member of the Company and dismissing directors violates the Closing

---

**2.** The group of putative Board of Directors members who make up "the Disputed Board Members" is comprised of slightly different members for the purposes of *Gluck v. Chevre* as compared to *Chevre v. Grunwald.* In *Chevre v. Grunwald,* the Disputed Board Members were Thomas Paneth, Paul Zickerman, Elisha Roseman, George Margaretten, Marcel Gross, Abraham Kleinbart, Moshe Gottesman, Bernard Rosenbloom and Leah Werner. In *Gluck v. Chevre,* Edgar Gluck and Yaakov Singer were added as plaintiffs and Marcel Gross was removed. However, for ease of identifying the parties in the set of law suits at issue, the "Disputed Board Members" is used to identify the largely overlapping groups of board members that constituted the defendants in *Chevre v. Grunwald* and that constitute the plaintiffs in *Gluck v. Chevre* and in the instant action.

Agreement and thereby places the Company in jeopardy of losing its not-for-profit status." *Id.* at ¶ 4. Indeed, the Closing Agreement required that NSG's board contain at least eight independent board members—that is, board members not closely affiliated with Chevre—out of thirteen total members. *Id.* at ¶ 4, 28.

In June of 2006, two months after the Closing Agreement was executed, NSG's board took steps to "effectuate the Closing Agreement" by changing the bylaws so that they mandated the proportion of independent directors required by the Closing Agreement. *Id.* at ¶ 32. However, after two of the original thirteen board members declined to serve, two new directors—both now Disputed Board Members—were elected by the board in November 2006 in compliance with the procedures set forth in NSG's amended bylaws and the Closing Agreement. *Id.* at ¶ 34–35.

Because Morris Klein falsely told some board members that the Closing Agreement required Chevre to be a member, the board's June 2006 amendments to the bylaws included Chevre as a member of the corporation with but with no voting power. *Id.* at ¶ 33.[3] Then, in contravention of what the Disputed Board Members believed was Chevre's non-voting membership status, Chevre purportedly disbanded the board, removing the Disputed Board Members without notice, on November 20, 2006. *Id.* at ¶ 36, 37. As a result of this allegedly invalid act, the Disputed Board Members, still acting as the board of NSG, removed Chevre entirely as a member of NSG at a November 30, 2006 meeting. *Id.* at ¶ 41. At this same meeting, another

independent director resigned, an inside director was removed, and two new directors were appointed to fill these vacancies (now both Disputed Board Members). *Id.* at ¶ 39–40.

The Disputed Board Members then held another board meeting at which they fired Morris Klein on December 7, 2006, because he had put the Closing Agreement in jeopardy by misleading the IRS, among other misdeeds. *Id.* at ¶ 42, 48. On December 27, 2006, Chevre held a second member meeting and again purportedly removed the Disputed Board Members from NSG's board, after proper notice. *Id.* at ¶ 45–47. This removal prompted the Disputed Board Members to file *Gluck v. Chevre* in state court, seeking a declaratory judgment that they are still members of the board, that Chevre is not a member of the corporation and that Morris Klein does not act on behalf of NSG. *Id.* at ¶ 54.

### c. The Counterclaim in *Gluck v. Chevre*

In response to the Disputed Board Members' allegations in *Gluck v. Chevre*, Chevre and Morris Klein brought a counterclaim on January 31, 2007.[4] Def. Ex. 5 ¶ 110. The facts alleged in this counterclaim, which mirror those in the *Chevre v. Grunwald* complaint, are described below.

The counterclaim again alleges that NSG's tax difficulties were brought on, in part, because of the activities of Joseph Grunwald. *See, e.g., id.* at ¶ 82. It then emphasizes the portions of the Closing Agreement that required governance changes in NSG, including an examination

---

3. However, the Disputed Board Members assert that, contrary to what Morris Klein told them, Chevre's new status as a non-voting member was in fact invalid because Chevre was not permitted to be a member of NSG at all under the Closing Agreement. *Id.* at ¶ 33.

4. Plaintiffs allege that Morris Klein has withdrawn from the counterclaim by filing an amended answer that does not set forth a counterclaim. *E.g.*, Pl. Mem. of Law in Supp. of Mot. for Summ. J. at 10.

of NSG's executive compensation. *Id.* at ¶ 90, 95.

Prior to the Closing Agreement, Grunwald was receiving over $600,000 in total compensation while working about ten hours per week for NSG. *Id.* at ¶ 96–97. Chevre and Klein told Grunwald he would have to increase his hours, reduce his compensation and refund any excess compensation. *Id.* at ¶ 98. Grunwald then demanded that his "equity" be purchased. *Id.* at ¶ 99. Chevre responded that such a purchase would violate New York nonprofit law and the Closing Agreement. *Id.* at ¶ 100–01.

At this point, and at Grunwald's behest, NSG's board elected new membership that was not sufficiently independent to satisfy the requirements of the Closing Agreement. *Id.* at ¶ 102–04. In response, Chevre held a member meeting on November 20, 2006, at which it removed the Disputed Board Members in order to ensure that the board took no actions that were "in violation of the directors' fiduciary duties...." *Id.* at ¶ 105–07. When the Disputed Board Members brought *Gluck v. Chevre* to challenge their removal, Chevre and Klein asserted the counterclaim, requesting a declaratory judgment that the Disputed Board Members were not directors and could not take any further action on behalf of NSG. *Id.* at ¶ 110. Both parties in *Gluck v. Chevre* moved for summary judgment. This was denied by the New York trial court on September 19, 2007, on the grounds that summary judgment was premature because more disclosure was needed. Def. Ex. 20 at p. 3. As of yet, neither the claim nor the counterclaim in *Gluck v. Chevre* has been resolved.

The Disputed Board Members are now seeking to have the costs of both these state court law suits covered by Executive Risk, under the terms of NSG's DO & T Liability Insurance policy. For its part, Executive Risk claims that this policy contains exclusions that excuse Executive Risk from coverage. A description of this policy is therefore in order.

### (3)

### The Insurance Applications and the Terms of Coverage

#### a. The Renewal Applications

NSG maintained liability insurance for its board members and officers through Executive Risk. This insurance had to be renewed each year. *See* Pl. Ex. D. In connection with this renewal process, NSG was required to submit an application which, among other things, posed a series of questions to NSG. *See id.* In its 2005 renewal application, NSG was asked: "Is there any pending or anticipated challenge to the Applicant's tax-exempt status under applicable law, whether federal, state or local?" Pl. Ex. D at I.5. NSG checked "Yes," circled "federal" and apparently listed the entities within NSG that were subject to the challenge. *Id.* The 2005 renewal application was signed by Morris Klein on June 10, 2005. *Id.* at p. 8.

The 2006 renewal application asked the same question. Pl. Ex. E at I.5. This time, the answer was checked "No;" no explanation was given. *Id.* The 2006 application also asked: "Has any Entity proposed for this insurance entered into a criminal or civil settlement with the United States or with some party acting on behalf of the United States by which claims against such entity were resolved?" *Id.* at II.B.17. NSG answered "No."[5] *Id.* This application

---

5. It is unclear why the 2006 application misstated the existence of the Closing Agreement, particularly given that it might have de-creased, rather than increased, the risk of insuring NSG as a not-for-profit, as it ended a challenge to NSG's not-for-profit tax status.

was signed by Klein on June 1, 2006. *Id.* at p. 8. As noted above, Klein signed the Closing Agreement with the IRS about two months earlier, on April 7, 2006. Def. Ex. 6 at p. 17.

During discovery, the Disputed Board Members deposed Brook Joiner, a claims attorney produced by Executive Risk to explain its underwriting practices. Pl. Ex. F at p. 4 ln. 2–15, p. 7 ln. 16. Ms. Joiner was asked about the combined effect of the answers on the 2005 and 2006 applications. She was directed to the fact that NSG's 2005 application indicated that there *was* a pending or anticipated challenge to NSG's non-profit status and then the 2006 application indicated that there *was no* pending or anticipated challenge. She was asked if these two answers, viewed together, effectively indicated that a settlement had been reached. She answered that "[i]t indicates that there was no longer a pending or anticipated challenge. I'm not sure it necessarily indicates that there was a settlement." Pl. Ex. F at p. 31 ln. 12–15. She did not, however, give any further information as to what else she thought it might indicate. *Id.*

### b. The Terms of the Policy

The insurance policy in force at the relevant time has several pertinent clauses. In defining its coverage, the policy indicates that it will pay "on behalf of the Insured Persons Loss from Claims first made against them during the Policy period...." Def. Ex. 1 at I.A; *see also id.* at Endorsement 1. In an endorsement, the policy sets out a duty for the insurer to defend the insureds for any claim, even if the claim is false, fraudulent or groundless, up to the limit of liability. *Id.* at Endorsement 14. The policy also specifies that "'[l]oss' means any amount, including Defense Expenses ... which an Insured is obligated to pay as a result of a Claim. ...." *Id.* at II.G. "'Defense Expenses' means reasonable legal fees and expenses incurred by an Insured in defense of a Claim...." *Id.* at II.C.

The policy includes several other relevant definitions. "'Insured' means the Insured Entity and any Insured Person...." *Id.* at II.D. An "'Insured Person' means any past, present or future director, officer, trustee .... of the Insured Entity...." *Id.* at II.F. The "'Insured Entity' means the Parent Organization and any Subsidiary as of the Inception Date [as well as certain other Subsidiaries]...." *Id.* at II.E. In this case, the Parent Organization is NSG. *Id.* at p. 8.

Of particular importance, the 2006 renewal application stated that "it is agreed that ... any claim arising from any fact, circumstance, situation, transaction, event, act, error, or omission required to be disclosed in response to Questions 14, 15, 16, 17 or 21 is excluded from the proposed insurance." Def. Ex. 2 at p. 5. The question on the 2006 renewal application that asked whether NSG had entered into any settlements with the federal government was question seventeen. *Id.* at I.17. The policy itself incorporated the application by indicating that "[t]he Insureds represent that the particulars and statements contained in the Application are true and

However, no testimony or affidavit by Morris Klein explaining the misrepresentation has been presented, and the plaintiffs nowhere argue that the failure to disclose the Closing Agreement was due to a failure to comprehend the question. Therefore, NSG appears bound by Klein's misrepresentation. *See Curanovic v. New York Cent. Mut. Fire Ins. Co.,* 307 A.D.2d 435, 437, 762 N.Y.S.2d 148, 150–151 (3rd Dep't 2003) ("The signer of a contract is conclusively bound by it regardless of whether he or she actually read it.... [And an insured] has a duty to review the entire application and to correct any incorrect or incomplete answers.") (internal marks and citations omitted).

agree that ... those particulars and statements ... are to be considered as incorporated into ... this Policy...." Def. Ex. 1 at IV.H.

Finally, the policy sets forth what is known as an *"Insured v. Insured"* exception. It reads that "[t]he Underwriter shall not pay Loss, including Defense Expenses, for Claims: .... [made] by or at the behest of the Insured Entity, except that this exclusion shall not apply to any derivative action brought totally independently of, and without the solicitation, assistance, participation, or intervention of, any of the Insureds...." *Id.* at III.B.3.

## Discussion

### (1)

### General Standards Governing Insurance Exclusions

■ In a contract dispute, summary judgment is only appropriate where the agreement's language is unambiguous. *Sayers v. Rochester Tel. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993). Where an insurance contract provides for a duty to defend, that duty applies "whenever the four corners of the complaint suggest—or the insurer has actual knowledge of facts establishing—a reasonable possibility of coverage." *Cont'l Cas. Co. v. Rapid–Am. Corp.,* 80 N.Y.2d 640, 648, 609 N.E.2d 506, 509, 593 N.Y.S.2d 966, 969 (1993). Therefore:

> To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer

may eventually be held obligated to indemnify the insured under any policy provision. If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action.

*Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.,* 91 N.Y.2d 169, 175, 690 N.E.2d 866, 868–69, 667 N.Y.S.2d 982, 984–85 (1997) (internal quotations and citations omitted). "[T]he court, in deciding whether an insurer has a duty to defend, may consider extrinsic facts submitted by the insured to show that coverage under a policy may exist. On the other hand, the insurer cannot use extrinsic facts to show that there is no coverage." *Petr–All Petroleum Corp. v. Fireman's Ins. Co. of Newark, N.J.,* 188 A.D.2d 139, 142, 593 N.Y.S.2d 693, 695 (4th Dep't 1993) (citation omitted).

### (2)

### Whether the Plaintiffs' Claims are Excluded from Coverage

■ Defendant argues that it is not required to defend the plaintiffs because their claims fall under two policy exclusions. First, defendant argues that coverage is excluded by NSG's failure to disclose the Closing Agreement, which triggered the exclusion in the renewal application for claims "arising from" certain facts if NSG failed to disclose them in response to questions on the application. Second, defendant argues that coverage is excluded by the *Insured v. Insured* exception, which excludes coverage for suits brought by or at the behest of the Insured Entity—NSG. Plaintiffs, for their part, argue that they satisfy the conditions for coverage and that no exclusion applies to their claims.[6] Because

---

**6.** Although plaintiffs allege that defendant initially indicated that coverage would be present for part of the underlying litigation, plaintiffs do not argue defendant has waived either

coverage is entirely excluded by the "arising from" exclusion, the other issues need not be discussed.

### a. "Arising from"

As noted above, the 2006 renewal application stated that "it is agreed that ... any claim arising from any fact, circumstance, situation, transaction, event, act, error, or omission required to be disclosed in response to Questions 14, 15, 16, 17 or 21 is excluded from the proposed insurance." Def. Ex. 2 at p. 5.[7] Question seventeen of the 2006 application asked: "Has any Entity proposed for this insurance entered into a criminal or civil settlement with the United States or with some party acting on behalf of the United States by which claims against such entity were resolved?" *Id.* at II.B.17. To this question, NSG answered "No." *Id.* Based on these facts, defendant argues that plaintiffs were required to disclose the Closing Agreement and failed to do so. Defendant further contends that, per the terms of the "arising from" exclusion, the claims at issue here arise out of the Closing Agreement and are therefore not covered. Each of these arguments will be considered in turn.

### i. Whether Plaintiff Effectively Disclosed the Closing Agreement

In response to defendant's contention that plaintiffs failed to disclose the Closing Agreement, plaintiffs make three arguments. *First,* they argue that NSG effectively did disclose the Closing Agreement. Plaintiffs note that the NSG's answer to question five on the 2005 renewal application disclosed that there was a pending or anticipated challenge to NSG's non-profit status. Pl. Ex. D at I.5. NSG's answer to question five on the 2006 application, by contrast, indicated that there was no pending or anticipated challenge to NSG's non-profit status. Pl. Ex. E at I.5. Plaintiffs argue that the only plausible explanation for the two responses is that a challenge to NSG's non-profit status was raised and settled. Moreover, they argue that the deposition testimony of Ms. Joiner supports this interpretation. Accordingly, plaintiffs contend that defendant was on notice of the Closing Agreement.

This argument is wide of the mark, most obviously because even if this series of answers should have put Executive Risk on notice that it needed to ask whether or not there had been a settlement, the application did precisely that. Executive Risk's renewal application specifically asked in

of the primary coverage exclusions at issue here. Moreover, plaintiffs specifically state that they are not arguing for coverage based on estoppel. Accordingly, neither of these issues will be discussed further.

7. The text of this exclusion is not, in one respect, a model of clarity. Read literally and in isolation, it would appear to exclude claims arising from anything that should be disclosed in response to the listed set of questions—whether or not it actually was disclosed. *Cf. St. Paul Fire & Marine Ins. Co. v. Sledjeski & Tierney, PLLC,* No. 08–CV–5184, 2009 WL 2151425, at *4 (E.D.N.Y. July 17, 2009) (finding that the prior knowledge exclusion in that case allowed insurer to disclaim coverage even for a reported risk, because "the lan-

guage of [the exclusion] makes no reference to the issue of notification. ... [The exclusion] does not depend on whether or not notice of the alleged error was provided ... prior to the inception date."). If the clause here were interpreted this broadly, it would not matter whether plaintiff had "effectively disclosed" the Closing Agreement—whether disclosed or not, coverage would be barred for claims arising from it. However, defendant does not argue for this broader interpretation of the clause and, in any event, it is clear that plaintiffs did not disclose the Closing Agreement. Therefore, the issue of whether the defendant could disclaim coverage if the Closing Agreement had been disclosed is not presented.

question seventeen whether there had been any settlements with the government, and NSG responded "No." Pl. Ex. E II. B.17.

Moreover, this argument assumes that the "Yes" answer to the question of whether there was a pending or anticipated challenge to NSG's non-profit status in 2005, coupled with the "No" answer in 2006, clearly indicated a settlement. However, a challenge to an organization's non-profit status could end without a settlement. The IRS could simply drop the challenge after finding that it was unsubstantiated. Similarly, an anticipated challenge, which would also prompt a "Yes" answer to question five of 2005 application, could simply fail to materialize. Either of these circumstances would yield the same pattern of answers that NSG gave to question five: a "Yes" on the 2005 application and a "No" on the 2006 application. Moreover, Ms. Joiner testified at her deposition that these two answers would not necessarily indicate that there was a settlement. Pl. Ex. F at p. 31 ln. 12–15. Therefore, this sequence of answers did not put defendant on notice of the Closing Agreement.

*Second,* plaintiffs argue that their answers on the 2005 and 2006 renewal applications put defendant on a duty of inquiry regarding the possibility of a settlement. In one version of this argument, plaintiffs claim that the answers on the 2006 renewal application constituted an omission that defendant waived by failing to inquire. *See Philadelphia Indemnity Insurance Company v. Horowitz, Greener & Stengel, et. al.,* 379 F.Supp.2d 442, 453 (S.D.N.Y. 2005) (finding, under New York law, that "where upon the face of an insurance application, a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they waive the want or imperfection in the answer, and

render the omission to answer more fully immaterial") (internal marks omitted); *see also Axis Reinsurance Co. v. Bennett,* Nos. 07 Civ. 7924, 08 Civ. 3242, 2008 WL 2485388, at *11–12 (S.D.N.Y. Jun. 19, 2008) (finding that where question in insurance application was not answered at all and insurer did not follow up, insurer waived objection to coverage based upon failure to answer).

This rule, however, is inapplicable to the facts of this case. *Philadelphia Indemnity* found that there was a duty of inquiry when the insurer was faced with an omission, not an affirmatively false statement. Here, NSG's answer to question seventeen on the 2006 renewal application was not incomplete—it was affirmatively false. It said there had been no settlement when, in fact, there had been a settlement. Pl. Ex. E II.B.17. This outright falsity did not create a duty of inquiry. *See Philadelphia Indem.,* 379 F.Supp.2d at 454 ("[A]n insurer is entitled to rely on the representations of the insured and ... is under no duty to investigate the truthfulness of the representations.") (quoting collected cases).

In another version of this argument, plaintiffs argue more generically that defendant had reason to follow up and ask for more information. They invoke the principle that courts "equate the knowledge the insurers could have gained through reasonable inquiry with actual knowledge of facts sufficient to defeat their right to rescind." *Foremost Guar. Corp. v. Meritor Sav. Bank,* 910 F.2d 118, 127 (4th Cir.1990). This principle, however, requires that the insurer have a reason to undertake further inquiry in the first place. *See id.* (finding no right to rescind a policy on the grounds that "insurers' possession of the placement memorandum provided the reason to inquire and a reasonable inquiry would have disclosed the misrepresentations.").

In our case, defendant had no information that should have caused it to inquire further than it did. As noted above, plaintiffs' answers on the 2005 and 2006 renewal applications could be explained by either an anticipated challenge to NSG's non-profit status that never materialized or by a challenge in which NSG prevailed. Each of these is entirely plausible and neither would raise suspicion, particularly when coupled with a specific inquiry into whether there had been a settlement, to which the response was "No." Thus, defendant neither knew nor should have known of the settlement agreement.

*Third,* plaintiffs argue that even if NSG did not inform the defendant of the Closing Agreement and even if defendant had no reason to inquire further, NSG's answer still cannot deprive them of coverage because it was not material. For its part, defendant argues that the materiality inquiry has no place in interpreting exclusions.

Plaintiffs base their materiality argument on a New York statutory provision providing: "No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material." N.Y. Ins. Law § 3105(b) (McKinney 2009). Defendant is not trying to avoid, i.e., rescind the insurance policy at issue here, but plaintiffs believe that defendant is also prohibited from "defeating [their] recovery" under the policy unless their misrepresentation was material.

Defendant, however, is correct that the materiality inquiry appears to have no place in a determination of whether or not a particular exclusion applies. Instead, an insurer in defendant's situation has two separate affirmative defenses available to it: first, that a particular exclusion serves to bar the claim at issue (as defendant is claiming); and second, that a material misrepresentation should allow the insurer to avoid paying entirely on a contract (which defendant is not claiming). To be sure, the language of the statute, that no misrepresentation should "defeat recovery" unless it is material, might be interpreted to apply both in rescission cases and in determining whether recovery under a particular contract is possible.[8] However,

---

**8.** Despite the potentially broad applicability of the statute, numerous cases applying New York law have treated these two affirmative defenses separately, albeit without an analysis of the statutory language, and have found that specific exclusions can operate to bar a claim irrespective of whether or not a material misrepresentation was made in the insurance application. *See XL Specialty Ins. Co. v. Agoglia,* Nos. 08–CV3821, 08–CV–4196, 08–CV–5252, 2009 WL 1227485, at *6–10 (S.D.N.Y. April 30, 2009) (analyzing whether prior knowledge exclusions-similar to the one at issue here—prevented claim based on known but undisclosed facts without conducting inquiry into materiality of those facts); *Axis Reinsurance Co. v. Bennett,* 2008 WL 2485388, at *12–15 (finding question of fact as to whether exclusion disclaiming coverage for "claims of which any insured had knowledge" was part of policy, but further finding that if it was, it could be used to deny coverage); *Home Ins. Co. of Ill. v. Spectrum Info.* *Techs., Inc.,* 930 F.Supp. 825, 835–41, 848–49 (E.D.N.Y.1996) (analyzing separately whether contract could be rescinded based on material misrepresentation, or alternately whether coverage was precluded by any of the exclusions in the policy); *Barkan v. New York Schools Ins. Reciprocal,* 65 A.D.3d 1061, 1063–64, 886 N.Y.S.2d 414, 418 (2d Dep't 2009) (analyzing separately whether insurer could rescind on the basis of a material misrepresentation, or alternately whether insurer had clearly demonstrated that an exclusion applied); *Waters v. New York Property Ins. Underwriting Ass'n,* No. 117342/03, 9 Misc.3d 1126(A), 2005 WL 2934822, at *2 (Sup.Ct. N.Y. County Sept. 29, 2005)(finding that a misrepresentation on an application placed the claim within an exclusion without addressing materiality, and separately finding that insurer was entitled to rescind the contract on the basis of the materiality of the misrepresentation); *Fed. Ins. Co. v. Tyco In-*

this language should not be read to extend a materiality requirement to contractual exclusions, because excluded claims are, by prior agreement, not part of the insurance contract. *See Tyco Intern. Litd.*, 2004 WL 583829, at *6 ("[An] insurer has no duty [to defend] if, as a matter of law, the allegations in the complaint ... fall within a policy exclusion."); *see also Miller v. Am. Eagle Fire Ins. Co.*, 253 N.Y. 64, 67, 170 N.E. 495, 496 (1930) ("The insurance company may be strictly held to its policy; its contract may even be liberally construed in favor of the policyholder, but the losses which it has specifically excluded cannot be brought within the insurance by a ruling of the courts.").

While no case has directly grappled with this issue,[9] legislative history confirms that exclusions are not subject to the materiality inquiry of Insurance Law § 3105 or § 3106.[10] During a 1938 public hearing on the proposed bill that eventually added sections 3105 and 3106 to New York's Insurance Law, one participant expressed concern that the addition of a materiality requirement for warranties might "deny the application of any exclusion in [a] policy as a straight exclusion." Transcript of Public Hearing, Joint Legislative Committee for Recodification of the Insurance Law, dated Nov. 18, 1938, Bill Jacket, ch. 882, L.1939, at 664. The Chairman of the Committee on Insurance Law Revision re-

*tern. Litd.*, No. 600507/03, 2 Misc.3d 1006(A), 2004 WL 583829, at *4–6 (Sup.Ct. N.Y. County March 5, 2004) (analyzing separately the issues of whether an exclusion applied to bar coverage or whether a claim of rescission due to material misrepresentation allowed insurer to avoid paying defense expenses).

9. The case that comes closest to addressing whether materiality applies to exclusions is *Guideone Specialty Mutual Ins. Co. v. Congregation Adas Yereim*, a recent Eastern District of New York decision. 593 F.Supp.2d 471, 486 (E.D.N.Y.2009). There, it was determined that Insurance Law § 3105 applies only when an insurer is seeking the remedy of rescission. *Id.* In that case, an insurer sought to avoid liability for a particular claim under an insurance contract by claiming that a material misrepresentation in the contract allowed it to disclaim an obligation to pay a claim arising from that misrepresentation, even if the contract was not voided. *Id.* The court disagreed, and found that § 3105(b) provides only the remedy of rescission in response to a material misrepresentation, not the remedy of disclaiming coverage: "Where an insurer complains ... about misrepresentations, New York law arms the insurer only with the hatchet of rescission and not the scalpel of unilateral modification." *Id.* The court noted that New York law separately empowers an insurer "to disclaim coverage for particular occurrences without having to establish its right to rescind or to invalidate

the entire contract," through policy exclusions. *Id.* In sum and substance, though in a different context, this conclusion amounted to a finding that exclusions are not subject to the materiality inquiry of § 3105.

Plaintiffs cite *Slevin v. Amex Life Assurance Co.*, 695 F.Supp. 712 (E.D.N.Y.1988), in support of their position that NSG's misrepresentation must be found material before an exclusion should apply. However, *Slevin* did not deal with an exclusion, but rather with the typical materiality question of whether an insurer could rescind its contract and return the premiums paid in order to avoid paying under a life insurance contract on the basis of a misrepresentation in the insured's application. *See id.* at 713–14.

10. Section 3106 extends a similar materiality requirement in the case of warranties made in insurance contracts: "A breach of warranty shall not avoid an insurance contract or defeat recovery thereunder unless such breach materially increases the risk of loss, damage or injury within the coverage of the contract." N.Y. Ins. Law § 3106(b) (McKinney 2009). In practice, however, the category of warranties in insurance contracts has largely been subsumed by representations, as another provision of the insurance law mandates: "All statements made by, or by the authority of, the applicant for the issuance, reinstatement or renewal of any such policy or contract shall be deemed representations and not warranties." *Id.* at § 3204(c).

sponded: "No, absolutely not.... There is no limitation on exclusion.... As long as you are excluding certain causes of loss, then what you say is 'I will pay if loss occurs due to certain causes other than these,' but if you say 'I will pay if certain facts do not occur which might increase the risk of loss' although they do not cause it [then materiality will apply]." *Id.* at 664–65. This excerpt of legislative history makes clear that the amendments to the insurance law were not intended to subject exclusions written into insurance contracts to the materiality test.

This history also elucidates why exclusions differ from misrepresentations such that they fall outside the ambit of section 3105. The transcript illustrates that the purpose behind the materiality provision was to stop an insurer from *ex post* disclaiming an insurance contract, which proved to be a bad deal only in hindsight, by nitpicking the insurance application for minor misrepresentations unrelated to the claim for which coverage was being sought.[11] *See id.* at 662–64. The law therefore requires that if an insurer is making a general disclaimer of coverage based on a misrepresentation, this misrepresentation must have been material enough that knowledge of it would have altered the terms of the contract. *See id.* (explaining that materiality will apply if an insurer is seeking to avoid paying by arguing that a certain misrepresentation increased the general risk of loss, although it did not cause the specific loss being claimed for).

An exclusion, however, is different from an attempted *ex post* disclaimer of coverage. By including an exclusion, an insurer makes clear to the insured that any claim that arises from a *particular* fact will not be covered by the contract, whereas other claims are free to proceed. *See id.* (explaining that an insurer can still write in exclusions that state that certain causes of loss will not be covered under the contract). These exclusions are bargained-for contractual arrangements, and an insured is on notice before the contract is entered that such exclusions are not part of the coverage provided for the premium paid. *Cf. Inavest Enters. v. TRW Title Ins. of New York Inc.*, 189 A.D.2d 111, 113, 595 N.Y.S.2d 837, 838 (3d Dep't 1993) (exclusion in a title insurance contract was a "bargained for" liability "voluntarily assumed by plaintiff"). Thus, in contrast to situations where a claim, by the plain language of the contract, would be covered except that an insurer later alleges a material misrepresentation somewhere in the contract, exclusions let the insured know up front that claims arising from certain facts are not covered. This distinction seems to have convinced both the drafters and potential opponents of Insurance Law sections 3105 and 3106 that the materiality requirement would not extend to contractual exclusions. *See* Transcript of Public Hearing, at 663–64.

The conclusion that the materiality of NSG's misrepresentation in this particular case must be ignored is somewhat frustrating. Indeed, it seems quite possible that Executive Risk would have issued the

---

**11.** The specific dialogue illustrative of this purpose was:

Mr. Harbison: Supposing a man says that he is a clerk, when in fact he is a salesman. It would be very difficult to prove you would not have issued this policy to this man.

Mr. Patterson: Why should you escape liability unless you can establish that?

Mr. Harbison: Why shouldn't he in heaven's name tell the truth?

Mr. Patterson: Why should you object unless you are hurt by it?
*Id.* at 663–64.

same policy to NSG if the Closing Agreement had been disclosed, as a settlement securing NSG's non-profit tax status might have reduced NSG's riskiness. Nevertheless, for the reasons explained above, the exclusion at issue here must be given effect by its own terms, and without reference to materiality, to the extent that it is clearly written and unambiguous. *See Kimmins Indus. Service Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir.1994) ("In order to be enforced, exclusions or exceptions from policy coverage must be specific and clear; they are not to be extended by interpretation or implication.") (internal quotation marks omitted); *see also Greater New York Mut. Ins. Co. v. U.S. Underwriters Ins. Co.*, 36 A.D.3d 441, 442, 827 N.Y.S.2d 147, 148 (1st Dep't 2007) ("It is well established that when interpreting an insurance contract, as with any written contract, the court must afford the unambiguous provisions of the policy their plain and ordinary meaning. . . ."). The "arising from" exclusion contained in the Executive Risk application—and incorporated into the contract—states:

> [I]t is agreed that . . . any claim arising from any fact, circumstance, situation, transaction, event, act, error, or omission *required to be disclosed* in response to Questions 14, 15, 16, 17, or 21 is excluded from the proposed insurance.

Def. Ex. 2 at 5 (emphasis added). This exclusion plainly eliminates coverage for claims arising from those facts, etc. "required to be disclosed" that are not actually disclosed in response to the specified questions. Plaintiffs do not challenge that the existence of the Closing Agreement was a fact "required to be disclosed" in response to question seventeen. Thus, NSG's failure to disclose the agreement places claims "arising from" the Closing Agreement within an exclusion to NSG's DO & T policy.

### ii. Whether Plaintiffs Request for Coverage "Arose From" the Closing Agreement

It remains for defendant to show that the claims asserted by plaintiffs arose from the Closing Agreement. The term "arising from," or synonymously "arising out of,"[12] should be interpreted as narrowly as possible in an insurance exclusion, because any ambiguities in insurance contracts should be resolved in favor of the insured. *See M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685, 686 (2d Cir.1989) (applying New York law) ("Exclusionary clauses are given the interpretation most beneficial to the insured."); 2 Insurance Claims and Disputes 5th § 11:22 (2009) (explaining, in the context of exclusions related to automobile use: "Since uncertainties as to the existence of coverage must be resolved in favor of the insured . . . the same facts can result in different conclusions depending upon whether it is in the insured's interest to view the injury as one arising out of the use of an automobile."). Nevertheless, it appears that even under a demanding application of the "arising from" test, the claim in *Chevre v. Grunwald* and both the claim and counterclaim in *Gluck v. Chevre* "arose from" the Closing Agreement.

---

**12.** While the renewal contract at issue here uses the term "arise from," and not the more common term "arise out of," these two terms appear to be used synonymously. *See, e.g., Maroney v. New York Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472, 839 N.E.2d 886, 889–90, 805 N.Y.S.2d 533, 536 (2005) (using "arise out of" and "arise from" interchangeably).

Moreover, the New York Court of Appeals has found that "arise out of" and "based on" have substantially the same meaning, reinforcing the conclusion that the more similar phrases "arise out of" and "arise from" are synonymous. *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*, 88 N.Y.2d 347, 352, 668 N.E.2d 404, 406, 645 N.Y.S.2d 433, 435 (1996).

Under New York law, the phrase "arising out of" has been interpreted, in the context of insurance exclusions, to mean "originating from, incident to, or having connection with." *Maroney v. New York Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472, 839 N.E.2d 886, 889, 805 N.Y.S.2d 533, 536 (2005) (applying this definition to a coverage exclusion denying claims that "arose out of" uninsured premises) (quoting *Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.*, 91 A.D.2d 317, 320–21, 459 N.Y.S.2d 158, 161 (4th Dep't 1983) (adopting this definition in the context of a homeowner liability policy's automobile exclusion clause)). In order for an "arising out of" exclusion to apply, there must be "some causal relationship" between the claim and the excluded subject matter. *See id.*; *see also Worth Const. Co. v. Admiral Ins. Co.*, 10 N.Y.3d 411, 415, 888 N.E.2d 1043, 1045, 859 N.Y.S.2d 101, 103 (2008).

In practice, however, what the phrase "some causal relationship" means is less clear. Most courts, and at least one commentator, suggest that it should require something less than proximate causation. *See* 2 Insurance Claims and Disputes 5th § 11:22.10 & n. 28 (indicating that the term "arising out of" should not be construed to mean proximately caused by, and collecting cases from various jurisdictions holding that "arising out of" requires less than proximate causation). However, one Second Circuit case described the meaning of "arising out of" under New York law by tying it to the concept of proximate cause. *Kimmins*, 19 F.3d at 81–83. In *Kimmins*, the Second Circuit first acknowledged that New York courts understood "arising out of," as used in insurance exclusions, to have the broad meaning of "originating from, incident to, or having connection with," and that this requires "some causal relationship." 19 F.3d at 81–82 (quoting *Aetna Casualty*, 91 A.D.2d at 320–21, 459

N.Y.S.2d 158). It then went on, however, to find that even those New York courts adopting this broader phrasing were in fact applying a causal test "tantamount to proximate causation," whether or not their rulings "were expressed … in terms of proximate causation." *Id.* at 82, 83.

However, post-*Kimmins*, the New York Court of Appeals continued to state that "arising out of" "*only* requires some causal connection," rather than explicitly adopting *Kimmins'* view that proximate causation is necessary. *See Maroney*, 5 N.Y.3d at 472, 805 N.Y.S.2d 533, 839 N.E.2d 886 (emphasis added). However, the *Maroney* court still used language indicating that more than a tenuous causal connection is necessary to find that a claim "arose out of" an exclusion. Specifically, in discussing why there was a "sufficient causal connection" to find that an injury "arose out of" the excluded property at issue, the court described the injury as "directly related" to the excluded property and found a "direct connection" between the injury and the excluded location, but no "direct causal connection" between the injury and the insured location. *Maroney*, 5 N.Y.3d at 473–74, 805 N.Y.S.2d 533, 839 N.E.2d 886. Ultimately, then, while it remains somewhat unclear exactly what level of causation is necessary to find that a claim "arose out of" a particular fact or circumstance, *Maroney* at least suggests that New York law requires an inquiry into how "direct" the causal connection at issue is, though "direct" seems to mean something less than "proximate." *Id.* The Southern District of New York recently reached a similar conclusion when considering a D & O Liability Exclusion under New York law, finding that "arising out of" has a "broad" interpretation and applying a "but for" causality test. *See XL Specialty Ins. Co.*, 2009 WL 1227485, at *9–10.

Turning to the instant case, the allegations in each pleading will be discussed in succession to determine whether there is a "sufficient causal connection" between the claim at issue and the Closing Agreement to preclude coverage under the "arising from" exclusion. *Cf. Maroney,* 5 N.Y.3d at 473–74, 805 N.Y.S.2d 533, 839 N.E.2d 886. To make this determination, the "four corners" of each complaint and the "four corners" of the counterclaim must be examined to determine whether the claims clearly fall within the "arising from" exclusion. *Cont'l Cas. Co. v. Rapid–Am. Corp.,* 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506; *Frontier Insulation,* 91 N.Y.2d at 175, 667 N.Y.S.2d 982, 690 N.E.2d 866.[13] It happens that the complaint and counterclaim in the second action, *Gluck v. Chevre,* are the most easily treated and will therefore be examined first. In short, *Gluck v. Chevre* plainly arose from the Closing Agreement. Indeed, the Closing Agreement was the driving force behind the dispute that led to the suit.

As noted above, the plaintiffs in *Gluck v. Chevre* were NSG and the Disputed Board Members—most of whom were defendants in *Chevre v. Grunwald* and are plaintiffs in this action. Def. Ex. 4 at p. 1. The defendants were Chevre and Morris Klein. *Id.* The complaint indicates (1) that compliance with the Closing Agreement was imperative to the survival of NSG and (2) that compliance necessitated reducing the authority of Chevre over NSG. Def. Ex. 4 at ¶ 25–26, 33.

Therefore, as the complaint recites, the Disputed Board Members took steps to "effectuate the Closing Agreement" by amending the bylaws and electing new independent directors, and by making Chevre a non-voting member of NSG. *Id.* at ¶ 32–33. Chevre responded to these moves by removing the Disputed Board Members from NSG's board, first without proper notice and again after complying with the notice requirements. *See id.* at ¶ 37, 45–47. This removal of the Disputed Board Members led them to initiate *Gluck v. Chevre. See id.* ¶ 50–54. Accordingly, it is clear from the complaint in *Gluck v. Chevre* that the Disputed Board Member's attempt to implement the Closing Agreement was the driving cause of the dispute leading to the complaint for a declaratory judgment.

The counterclaim in *Gluck v. Chevre* also plainly states that it arose from the Closing Agreement. While there were tensions within NSG's board prior to the Closing Agreement, the Closing Agreement was the decisive event in triggering the dispute that led to the counterclaim, because reforms mandated by the Closing Agreement caused the dispute between Chevre, Morris Klein and Grunwald. The Closing Agreement also played a substantial role in ensuring that the intra-board conflict led to a law suit rather than being resolved without legal action.

It is helpful to revisit the general sequence of events alleged in the counterclaim in order to understand why they arose substantially from the Closing Agreement. The counterclaim, after ex-

---

**13.** The plaintiffs at one point argue that coverage should exist because the claims for which they are seeking coverage do not relate *solely* to matters raised in the Closing Agreement. *See* Pl. Mem. of Law in Supp. of Mot. for Partial Summ. J. at 15. However, this is not the relevant question; rather, as explained above, the complaints and counterclaim must be analyzed to determine whether there is a "some causal connection" between each suit and the Closing Agreement. The fact that other, concomitant causes might also exist does not preclude a finding that the Closing Agreement was one direct cause of the claims in the underlying actions.

plaining the reforms required by the Closing Agreement, alleged that Chevre and Klein approached Grunwald about reducing his compensation and increasing his hours, among other things. Def. Ex. 5 at ¶ 95, 98. Next, Grunwald demanded that his "equity" in NSG be purchased and, following Klein and Chevre's refusal, Grunwald took over NSG's board. *Id.* at ¶ 99, 102. Next, Chevre disbanded the board, ousting the Disputed Board Members. *Id.* at ¶ 107. Chevre and Klein then brought the counterclaim with the aim of securing a declaration that the Disputed Board Members, who were acting at the behest of Grunwald, had no authority. *See id.* at ¶ 103, 107–110.

Based on these events, the plaintiffs argue that the counterclaim arises out of the struggle for control of NSG instigated by Grunwald. This is true, but explains only a selective portion of the cause of the counterclaim. In fact, Grunwald's struggle for control of NSG led him to stack the board and demand an equity buyout specifically because NSG was trying to effectuate the governance changes required by the Closing Agreement, including reducing Grunwald's excessive compensation. *See id.* at ¶ 90, 95, 98–99, 102–03. Indeed, the counterclaim includes information on the audit of executive compensation required by the Closing Agreement, and then explains that Chevre and Klein told Grunwald that he would "have to" accept decreased compensation. *Id.* at ¶ 95, 98. This narrative makes clear that the Closing Agreement was central to sparking the dispute with Grunwald. Both the information and the imperative for Klein and Chevre's confrontation with Grunwald over his compensation—which in turn led to Grunwald's stacking of the board and the removal of the Disputed Board Members that the counterclaim seeks to have legitimated—arose from the Closing Agreement.

In addition to triggering the dispute, the Closing Agreement was a substantial factor in ensuring that it was not resolved and instead resulted in a suit. When Grunwald demanded that his equity be purchased, Chevre and Klein indicated that this was not possible because the Closing Agreement forbade it and they could not take steps that could jeopardize NSG's nonprofit status. *Id.* at ¶ 101. Similarly, when Grunwald stacked NSG's board with his allies, Chevre and Klein removed these Disputed Board Members at least partly because they found them lacking the independence required by the Closing Agreement. *Id.* at ¶ 104. Thus, there was a direct connection between the Closing Agreement and the need for Chevre and Klein to respond to Grunwald's demands with a law suit, in order to prevent a Grunwald-biased board from violating the Closing Agreement.

To be sure, there were other reasons for Chevre's response to Grunwald's demands. New York's non-profit law forbade buying out Grunwald's equity and Chevre effectively admits its desire to control NSG. *See id.* at ¶ 94, 100. Thus, Chevre's decision to remove the Disputed Board Members was also driven by its desire to avoid breaches of fiduciary duty by the directors, as plaintiffs argue. However, this is not at all inconsistent with an explanation that the Closing Agreement was also a substantial part of Chevre's motivation for disbanding the board. And the Closing Agreement need not be the only cause of their actions—it need merely have *some* causal connection. *Maroney,* 5 N.Y.3d at 472, 805 N.Y.S.2d 533, 839 N.E.2d 886. Here, the Closing Agreement clearly was one of the direct causes of the dispute in the underlying law suits and therefore had the requisite relation.

Plaintiffs also argue—regarding both the complaint and counterclaim in *Gluck v.*

*Chevre*—that the Closing Agreement was not central because the legal issues in the underlying actions revolved around New York law and not the terms of the Closing Agreement. Plaintiffs point to comments made by the state court in a hearing on the second action indicating that the validity of the Closing Agreement "does not affect questions before this court, which are questions involving the substantive law of this State." Pl. Ex. Q. at. p. 10. This, however, is not germane to the issue in the instant case. The issue here is not what legal standards govern the underlying actions but rather whether they, as a practical matter, arose from the Closing Agreement. For the reasons discussed above, both the second action and the counterclaim plainly did arise from the Closing Agreement, as the Closing Agreement had a direct causal connection to the suits.

The complaint in the first action bears many similarities to the counterclaim, which is unsurprising since Chevre was involved in bringing both pleadings. However, whether the first action arose out of the Closing Agreement is a closer question than the counterclaim. Unlike the counterclaim, the first action does not specifically allege that Chevre and Klein confronted Grunwald about his pay package as a result of the Closing Agreement and does not specifically discuss an audit of executive compensation. Also, the complaint in the first action attributes to Grunwald a motivation to create conflict within the board that is not necessarily tied to the Closing Agreement: his desire to privatize NSG for his personal benefit. Ex. 3 at ¶ 29. It could therefore be argued that the primary cause of the *Chevre v. Grunwald* dispute was Grunwald's acquisitiveness and not the Closing Agreement.

However, there are sufficient allegations in the complaint in the first action to establish that there was a direct causal connection between the Closing Agreement and the suit. First, there is an indication that Grunwald's demand that his equity be bought out was triggered by the Closing Agreement. As in the counterclaim, the first action notes that the Closing Agreement imposed "certain governance requirements." *Id.* at ¶ 35. Grunwald's request to retire and his demand to be bought out are discussed in the very next paragraph in the complaint, strongly implying that these events are connected. *Id.* at ¶ 36.

Additionally, the complaint also indicates that the first action plaintiffs said they could not buy out Grunwald's "equity" because it would violate the Closing Agreement, in addition to violating New York non-profit law. *Id.* at ¶ 37, 38. This refusal directly resulted in Grunwald's stacking of the board—the central action in dispute in *Chevre v. Grunwald. See id.* at ¶ 38–39. The fact that the Closing Agreement played a critical role in justifying Chevre's refusal to negotiate with Grunwald means that the Closing Agreement was a substantial cause of the law suit.

Crucially, the *Chevre v. Grunwald* complaint also includes the allegation that Grunwald's board violated the Closing Agreement because it was insufficiently independent. *Id.* at ¶ 40. This further establishes that the Closing Agreement was a substantial reason for plaintiffs in the first action to object to Grunwald's attempt to stack the board. After this, the first action contains the familiar allegations that Chevre wished to prevent any violations of fiduciary duties [14] and that it

---

14. Plaintiffs again argue that because one of Chevre's motivations for removing the Disputed Board Members was to prevent a violation

of their fiduciary duties, the *Chevre v. Grunwald* complaint cannot be said to arise from the Closing Agreement. However, this allega-

decided to purge the board by removing the Disputed Board Members. *Id.* at ¶ 42, 44. When the Disputed Board Members continued to act for NSG, plaintiffs brought suit. *Id.* at ¶ 47, 50. Given the inference that the Closing Agreement's governance reforms helped spark the dispute with Grunwald; the fact that the Closing Agreement was a central reason that Grunwald's demands to have his equity purchased were rebuffed, causing him to stack the board; and the fact that Chevre then purged the board in order to comply with the Closing Agreement, the Closing Agreement clearly had significant causal import in the first action. Thus, for the reasons discussed above, all three pleadings had a substantial causal connection to the Closing Agreement and all therefore arose from it. As a result, coverage for all three is excluded under the insurance policy.

### Conclusion

For the reasons stated above, the claims in all three pleadings arise from the Closing Agreement. They, therefore, fall under the "arising from" exclusion contained in the renewal application. For this reason, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

SO ORDERED.

tion does not detract from the causal import of the Closing Agreement in *Chevre v. Grunwald* for the same reasons noted above with respect to the counterclaim in *Gluck v. Chevre.* Additionally, the other arguments raised by plaintiffs regarding the counterclaim are unpersuasive as applied to the *Chevre v. Grunwald* complaint for similar reasons.